*263 In holding that such "incidental fallback" did not require a permit under the Clean Water Act, the Court of Appeals explained "that **334 the straightforward statutory term 'addition' cannot reasonably be said to encompass the situation in which material is removed from the waters of the United States and a small portion of it happens to fall back." Id. at 1404. The Court of Appeals accordingly directed the Corps to exclude "incidental fallback" from the definition of "discharge of dredged materials."
In directing the Corps to exclude "incidental fallback," the Court of Appeals specifically distinguished the discharges at issue in Rybachek from incidental fallback. Id. at 1406. It explained that Rybachek had:
"held that the material separated from gold and released into the stream constituted a pollutant, and, to the extent that 'the material discharged originally comes from the streambed itself, [its] resuspension [in the stream] may be interpreted to be an addition of a pollutant under the Act.' "
Id. (quoting Rybachek , 904 F.2d at 1285 ) (bracketed material added by National Mining Assoc. ). As the court explained in National Mining Assoc. , Rybachek addressed "the discrete act of dumping leftover material into the stream after it had been processed," not "imperfect extraction, i.e., extraction accompanied by incidental fallback of dirt and gravel." 145 F.3d at 1406.
Although the concept of incidental fallback seems relatively straightforward, defining the concept proved difficult. The Corps initially declined to define "incidental fallback" and explained that it would identify it on a case-by-case basis. See 64 Fed Reg 25120 (May 10, 1999). The next year, the Corps issued a proposed rule in the form of a rebuttable presumption that identified the types of mechanized earth-moving activities that ordinarily would result in the discharge of dredged material. See 65 Fed Reg 50108, 50111-12 (Aug 16, 2000). Procedurally, the effect of the proposed rule was to shift the burden of persuasion to the regulated party to prove that any discharge was only incidental fallback. Id. After receiving comments on the proposed rule, the Corps issued a final rule in 2001 that retained the substance of the presumption but stated that the burden of proof would not shift. 33 CFR § 323.2(d)(2)(i) (2001). Finally, in 2008, the Corps repealed the 2001 rule listing the type **335 of earth moving activities that ordinarily would result in the discharge of dredged material and simply excepted "incidental fallback," without further explanation, from the definition of discharge of dredged material. 33 CFR § 323.2 (d)(2)(iii) (2008).
Petitioners argue that the 2001 rule demonstrates that material discharged as a result of suction dredge mining constitutes "dredged material" over which the Corps has exclusive permitting authority.[16] We first set out the relevant terms of that rule and then explain why we reach a different conclusion.
The 2001 rule sought to define the phrase "incidental fallback" in two ways: first, by identifying the types of activities that ordinarily will result in something more than incidental fallback, 33 CFR § 323.2(d)(2)(i) (2001) ; and second, by providing a specific definition of the phrase, 33 CFR § 323.2(d)(2)(ii) (2001). Section 323.2(d)(2) (2001) provided:
"(i) The Corps and the EPA regard the use of mechanized earth-moving equipment to conduct land clearing, ditching, channelization, in-stream mining or other earth moving activity in waters of the United States as resulting in a discharge of dredged material unless project-specific evidence shows that the activity results in only incidental fallback. This paragraph (i) does not and is not intended to shift any burden in any administrative or judicial proceeding.
"(ii) Incidental fallback is the redeposit of small volumes of dredged material that is incidental to excavation activity in waters *264 of the United States when such material falls back to substantially the same place as the initial removal. Examples of incidental fallback include soil that is disturbed when dirt is shoveled and the back-spill that comes off the bucket when such small volume of soil or dirt falls into substantially the same place from which it was initially removed."
Petitioners argue that the reference to "in-stream mining" in paragraph (i) includes suction dredge mining **336 and, as a result, establishes that suction dredge mining ordinarily results in the discharge of dredged material that is subject to the Corps' permitting authority. Petitioners focus on only half the sentence. Although "in-stream mining" most likely includes suction dredge mining, the general rule stated in paragraph (i) applies only to "the use of mechanized earth-moving equipment to conduct *** in-stream mining." The small shop-vac-like equipment used to conduct suction dredge mining hardly qualifies as "mechanized earth-moving equipment," unless one views vacuum cleaners and other small suction devices as "mechanized earth-moving equipment." Were there any doubt about the matter, the explanation for the 2001 rule removes it. It explains that the phrase "mechanized earth-moving equipment" refers to "bulldozers, graders, backhoes, bucket dredges, and the like." 66 Fed Reg 4552 (Jan 17, 2001).
More importantly, the point of the rule was to distinguish large-scale earth moving activities where any redeposit of unprocessed dredged material into the water was likely to be a regulable discharge of dredged material from smaller scale activities where the redeposit of unprocessed dredged material was likely to be only "incidental fallback." The 2001 rule was not intended to determine, nor did it determine, whether discharges resulting from processing dredged material were subject to the Corps or the EPA's permitting authority. When both the entire rule and the reason for promulgating it are considered, we cannot agree with petitioners that the 2001 rule signaled a departure from the Corps and the EPA's stated position in the 1986 memorandum of agreement. Similarly, we do not agree with petitioners that the 2001 rule reflects the Corps' conclusion that discharges resulting from processing dredged material over water, as opposed to processing it over land, will be automatically subject to the Corps' permitting authority under section 404.
That same conclusion follows from the explanation for the 2001 final rule, which incorporated the preamble to the 2000 proposed rule.[17] See **337 66 Fed Reg 4552 (Jan 17, 2001). Specifically, the preamble to the 2000 proposed rule expressly recognized that the discharge of material resulting from placer mining is "the 'addition of a pollutant' under the [Clean Water Act] subject to EPA's section 402 regulatory authority." 65 Fed Reg 50110 (Aug 16, 2000).
In the preamble to the 2000 proposed rule, the Corps recognized that one problem in defining "incidental fallback" is that it shares many characteristics with regulable discharges of dredged material. See 65 Fed Reg 50109 (Aug 16, 2000). The Corps accordingly sought to identify the "nature of th[e] activities and the types of equipment used" that ordinarily will result in the regulable discharge of dredged materials. See id. The Corps also reviewed federal decisions holding that the redeposit of dredged material constituted a regulable discharge. See id. at 50110. In doing so, the Corps listed cases concluding that the discharge of unprocessed dredged material resulted in a discharge of dredged materials subject to the Corps' authority under section 404 of the Clean Water Act. See id . (discussing cases involving sidecasting of dredged material, the redeposit of dredged material on adjacent sea grass beds, and backfilling trenches with dredged material).
After citing cases involving the redeposit of unprocessed dredged material, the Corps cited one decision that involved the discharge of processed dredged material, which it distinguished *265 from the other cited cases with a "see also" cite. The explanation stated:
"see also, Rybachek v. EPA , 904 F.2d 976 [1276] (9th Cir. 1990) (removal of dirt and gravel from a stream bed and its subsequent redeposit in the waterway after segregation of minerals is 'an addition of a pollutant' under the CWA subject to EPA's section 402 regulatory authority)."
Id. That explanation is consistent with the District of Columbia Circuit's decision in National Mining Assoc. , which explained that Rybachek had addressed "the discrete act of dumping leftover material into the stream after it had been processed," not "imperfect extraction, i.e., **338 extraction accompanied by incidental fallback of dirt and gravel." See National Mining Assoc. , 145 F.3d at 1406. The Corps' description of Rybachek , however, went further than that and stated, consistently with the 1986 memorandum of agreement, that the material discharged as a result of placer mining "is 'an addition of a pollutant' under the CWA subject to EPA's section 402 regulatory authority." Far from suggesting an intent to depart from the conclusion in the 1986 memorandum of agreement, the 2001 final rule and the explanation for the 2000 proposed rule are consistent with the Corps' and the EPA's earlier conclusion that the discharge of placer mining waste is not the discharge of dredged material and that, as a result, the EPA is authorized to issue permits under section 402 of the Clean Water Act for the processed waste discharged as a result of suction dredge mining.
4. The Corps' 2008 rules
As explained above, the 1975 exception to the definition of "discharge of dredged material" identified one instance in which the act of processing dredged material will result in the discharge of a pollutant that requires a permit from the EPA under section 402. It did not, however, unambiguously resolve whether other instances of processing dredged material would result in such a discharge. The dissent reasons that, even if that is a correct interpretation of the 1975 definition of "discharge of dredged material," the 2008 version of that definition resolved the ambiguity. We reach a different conclusion. The 2008 version of the definition of "discharge of dredged material" left the relevant part of the 1975 regulations unchanged, and the differences between the 1975 version and the 2008 version of the definition provide no reason to think that the 2008 regulation somehow changed what the 1975 regulation meant when it was initially promulgated.
The relevant part of the 1975 definition of "discharge of dredged material" does not differ in any material respect from the 2008 definition. The 1975 regulation provided that "[t]he term 'discharge of dredged material' means any addition of dredged material * * * into navigable waters." 33 CFR § 209.120(5) (1976). It then provided that "[d]ischarges of **339 pollutants into navigable waters resulting from the onshore subsequent processing of dredged material that is extracted for any commercial purpose (other than fill) are not included within th[e] term [discharge of dredged material]." Id. The 2008 regulation says the same thing. It provides that "[e]xcept as provided in paragraph (d)(2) below, the term discharge of dredged material means any addition of dredged material into *** the waters of the United States." 33 CFR § 323.2(d)(1) (2009). Paragraph (d)(2) then provides that the term "discharge of dredged material does not include the following: *** discharges of pollutants into the waters of the United States resulting from the onshore subsequent processing of dredged material that is extracted for any commercial use (other than fill)." 33 CFR § 323.2(d)(2)(i) (2009).
There are two potentially relevant changes to the definition of the phrase "discharge of dredged material" between 1975 and 2008. First, the exceptions are organized slightly differently, an organizational change that occurred in 1993 and that prompted no discussion when it occurred. 58 Fed Reg 45008 (Aug 25, 1993), codified as 33 CFR § 323.2(d) (1994).[18] That is, the 1993 regulation (and the *266 2008 regulation) group initially two and later three exceptions together and put them in one place rather than stating each exception in a separate sentence, as the regulations did from 1977 to 1993.
Second, between 1975 and 2008, the Corps added two exceptions to the term "discharge of dredged material." In 1977, the Corps restated what had been an exception to the definition of "dredged material" for "material resulting from normal farming, silviculture, and ranching activities, such as plowing, cultivating, seeding, and harvesting, for the production of food, fiber, and forest products" and moved it to become an exception to the definition of "discharge of dredged material." See 33 CFR § 209.120(d)(4) (1976); 33 CFR § 323.2(l ) (1978). The Corps explained that it had intended in 1975 to make clear that "activities such **340 as plowing, seeding, harvesting, and any other activity by any other industry that do not involve discharges of dredged or fill material " do not require section 404 permits. 42 Fed Reg 37130 (July 19, 1977) (emphasis added). It reasoned that restating and moving that exception to the definition of "discharge of dredged material" clarified its intent to except only those ordinary sorts of activities that do not result in a discharge of dredged material.[19] Id. The third exception was added in 1999 (and restated several times) to exclude "incidental fallback" from the definition of discharge of dredged material. That exception is discussed at some length above.
The second and third exceptions (added in 1977 and 1999) are excluded from the definition of "discharge of dredged material" because the Corps concluded that they do not involve any "discharge" of dredged material. The first exception stands on a different footing. That exception assumes that there is a "discharge" but establishes that, as a result of the act of processing dredged material, the material discharged is a "pollutant" subject to section 402 rather than "dredged material" subject to section 404. That is, the second and third exceptions turn on the absence of a discharge; the first turns on the nature of the material being discharged.
Contrary to the dissent's reading of the 2008 definition of "discharge of dredged material," the changes to that definition between 1975 and 2008 provide no reason to say that the exception promulgated in 1975 means anything other than what it meant in 1975. Specifically, both the 1975 and the 2008 regulations leave open the question whether other instances of processing dredged material-namely, instances other than the one instance identified in the 1975 **341 exception-will result in the discharge of a pollutant subject to section 402 or the discharge of dredged material subject to section 404. It is precisely because the regulations leave that question open that the EPA and the Corps' application of the statute and regulations matters.
5. Regulatory approval
Either the EPA or a state agency acting under authority delegated by the EPA may issue a permit under section 402 of the Clean Water Act for the discharge of pollutants after providing an opportunity for a hearing. See 33 USC § 1342(a)(1) (permits issued by the EPA); 33 USC § 1342(b) (states acting under delegated authority). However, in considering regulatory approval of permits for suction dredge mining, we focus on permits issued by the EPA or the Corps and do not rely on permits issued by states, such as Oregon, that are acting pursuant to authority delegated by the EPA. Without some showing that the EPA has formally adopted a state agency's issuance of a permit, the *267 states' regulatory actions do not provide a strong basis for determining the meaning of a federal statute. Cf. DeCambre v. Brookline Housing Auth. , 826 F.3d 1, 19 (1st Cir 2016) (explaining that deference to state agency interpretations of federal statutes could undercut the uniform interpretation of federal law).
Focusing on the EPA's issuance of permits, the state argues and petitioners do not dispute that the Regional Administrator of the EPA has issued general permits for suction dredge mining in Alaska that were in effect from 1994 to 2015.[20] Not only has the EPA issued general permits for suction dredge mining in Alaska, but the Corps in Alaska administers a general permit for "mechanical placer mining," which notes that small scale suction dredge mining is not an activity covered by the Corps' general permit but is instead regulated under a permit issued by the state agency acting under delegated authority from the EPA.[21] Specifically, the Corps' permit provides that the **342 "use of a suction device to remove bottom substrate from a water bod[y] and discharges of material from a sluice box for the purpose of extracting gold or other precious metals *** [are] regulated by the ADEC [Alaska Department of Environmental Conservation] under a Section 402 Alaska Pollution Discharge Elimination System (APDES) permit."
To be sure, in 2012, the Corps extended another regional general permit, 2007-372-MI, that regulates "floating recovery devices" used for the purposes of recovering metals. That permit, however, was not issued under the Clean Water Act but under the Corps' authority under Section 10 of the Rivers and Harbors Act. Moreover, the Corps' permit excepts small suction dredge mining. It provides:
"[N]o Corps authorization is required for these operations. Recovery of metals in a Section 404 water results in discharge from a sluice, trommel, or screen, however this discharge is regulated by Alaska Department of Environmental Conservation (ADEC) under a Section 402, Alaska Pollutant Discharge Elimination System Permit (APEDS)."[22]
As the Corps' and the EPA's joint exercise of authority in Alaska demonstrates, those agencies have adhered to the distinction reflected in the 1986 memorandum of agreement and stated in the Corps' 1990 regulatory guidance letter. The EPA has issued permits for discharges resulting from small scale suction dredge mining, and the Corps has recognized the EPA's authority to do so.
Additionally, as noted above, in April 2018, the Regional Administrator of the EPA reissued a general permit for suction dredge mining in Idaho after notice and comment. Before doing so, the EPA addressed several comments questioning the EPA's authority to issue a permit for suction dredge mining. See EPA, Response to Comments on Idaho Small Suction Dredge General Permit at 3-7. Some **343 commenters took the position that suction dredge mining should not be regulated at all. Id. at 3-4. Similarly, others argued that the material discharged as a result of suction dredge mining was incidental fallback and thus not subject to regulation. Id. at 5-6. In responding to those comments, the EPA explained that "commenters often confuse the 'discharge of dredged material' with the 'discharge of a pollutant.' " Id. at 7. The EPA reaffirmed its position that the material discharged as a result of suction dredge mining was the "discharge of a pollutant" subject to regulation under section 402 and not incidental fallback, which does not constitute a regulable *268 discharge of dredged material. Id. The EPA then noted that, consistently with that conclusion, "the Corps routinely informs applicants who request a 404 permit for small suction dredging in Idaho that, unless a regulable discharge of dredged or fill material will occur, the EPA is the lead agency for the activity." Id.
The EPA thus reaffirmed that the material discharged as a result of suction dredge mining is a pollutant that requires a permit from the EPA under section 402 and not dredged material that requires a permit from the Corps under section 404. Petitioners argue, however, that the Corps has issued three permits that lead to a different conclusion. Specifically, they rely on two nationwide permits (NWP) issued by the Corps and a regional permit also issued by a division of the Corps. We consider each permit separately.
The first permit, NWP 19, authorizes dredging of "no more than 25 cubic yards below" the plane of the ordinary high water mark. 82 Fed Reg 1988 (Jan 6, 2017). Notably, NWP 19 only authorizes dredging-the removal of dredged material from navigable waters. It does not authorize the discharge or addition of dredged material to the navigable waters of the United States, which is the statutory predicate for a section 404 permit under the Clean Water Act. See National Mining Assoc. , 145 F.3d at 1404 (distinguishing between the Corps' authority to permit dredging under the Rivers and Harbors Act of 1899 and its authority to permit the discharge of dredged or fill material into navigable waters under section 404 of the Clean Water Act). Because a permit authorizing the removal of dredged material from **344 navigable water differs from a permit authorizing the discharge of dredged material into navigable water, NWP 19 does not advance petitioners' argument.
The second permit, NWP 44, is arguably closer to the mark. It authorizes the discharge of "dredged or fill material" into the nontidal waters of the United States for mining activities, provided that either the discharge does not cause the loss of "greater than 1/2-acre of nontidal wetlands" or as long as the total mined area does not exceed 1/2 acre for open waters, such as rivers, streams, lakes, and ponds. 82 Fed Reg 1994 (Jan 6, 2017). By its terms, NWP 44 applies to the issuance of a permit for a single mining project that can entail water impoundments and construction on fill or dredged material discharged into the water. See NWP 44, General Conditions Nos. 8, 9, 14, 15, 23, and 24. Moreover, it requires preconstruction notification for certain activities and remedial mitigation by the project proponent. Id.
At first blush, the fact that NWP 44 authorizes the discharge of dredged material for mining purposes appears to support petitioners' argument. On closer inspection, however, we reach a different conclusion. First, NWP 44 is directed at individual mining projects that can involve the impoundment of water and construction of temporary or permanent structures for mining, rather than recreational suction dredge mining. Second, in authorizing the discharge of up to one-half acre of fill or dredged material, NWP 44 appears to refer to unprocessed dredge material or fill. It does not expressly address whether processed dredged material remains subject to the Corps' permitting authority under section 404 or whether processing can result in the addition of a pollutant subject to the EPA's permitting authority under section 402. Third, and consistently with the second observation, the commentary to NWP 44 states that "[d]ischarges of processed mine materials into waters of the United States may require authorization [by the EPA] under section 402 of the Clean Water Act." 82 Fed Reg 1921 (Jan 6, 2017).
Finally, petitioners rely on a regional general permit that the Corps issued in 1995 for northern California **345 for "certain work activities and incidental discharges of dredged or fill material associated with suction dredge mining." Department of the Army, Regional General Permit No. 21181-98 (June 7, 1995). Again, at first blush, the permit appears to support petitioners' view that the Corps has exercised permitting authority over suction dredge mining. However, from 1961 to 2009, the State of California issued permits authorizing suction dredge mining under section 5653 of the California Fish and Wildlife Code, see People v. Rinehart , 1 Cal 5th 652, 658, 206 Cal.Rptr.3d 571, 377 P.3d 818 (2016), *269 cert den sub nom Rinehart v. California , --- U.S. ----, 138 S Ct 635, 199 L.Ed.2d 525 (2018),[23] and the Corps' permit on which petitioners rely specifically provides that "[w]ork under this regional general permit is authorized only for holders of current and valid California Department of Fish and Game [section] 5653 Permits * * * commonly referred to as 'standard permits', for the purpose of engaging in suction dredge mining for mineral extraction." (Emphasis added.)
Moreover, the Corps issued the 1995 regional permit two years after it promulgated the 1993 regulations that defined the "discharge" of dredged materials as including "any addition, including any redeposit, of dredged material, including excavated material, into the waters of the United States, which is incidental to any activity * * *." 32 CFR § 323.2(d)(1)(iii) (1994). That rule was later modified in 1999 to except "incidental fallback," and it is unclear whether the Corps' 1995 regional permit was issued merely to comply with the rules in effect from 1993 to 1999 that the discharge of unprocessed dredged material that was incidental to any activity required a permit under section 404 of the Clean Water Act. See Regional General Permit No. 21181-98 (authorizing "incidental discharges of dredged or fill material associated with suction dredge mining"). Beyond that, the 1995 regional permit does not purport to be the exclusive permitting authority for suction dredge mining but serves instead only as auxiliary authorization. The Corps' permit applies only if a person possesses a standard permit for suction dredge mining issued by the State of California.
**346 Finally, the 1995 regional permit expired on July 1, 2000, and petitioners do not identify any other permit issued by the Corps after it amended its regulations in 1999 to exclude incidental fallback that provides auxiliary authorization for incidental discharges resulting from suction dredge mining.
Ultimately, we do not view NWP 19, NWP 44, or Regional General Permit No. 21181-98 as persuasive authority for petitioners' position. Rather, NWP 19 does not authorize the discharge of dredged materials; the commentary to NWP 44 recognizes that the discharge of processed mining waste may require a permit from the EPA under section 402; and the 1995 regional general permit provided auxiliary authorization for incidental discharges associated with suction dredge mining at a time when the Corps' regulations recognized that any discharge of unprocessed dredged material that was "incidental to any activity" was a regulable discharge under section 404.
In our view, the regulatory history reveals that, from 1986 to 2018, the EPA and the Corps have been on the same page. From the 1986 memorandum of agreement between the EPA and the Corps to the general permits issued by the EPA in 2018 and the Corps in 2017, both agencies consistently have recognized that processed waste discharged as a result of suction dredge mining is a pollutant that requires a permit from the EPA under section 402. Similarly, they consistently have concluded that the discharge resulting from suction dredge mining is not "dredged material" that requires a permit from the Corps under section 404. With that regulatory history in mind, we turn to the deference owed those agency decisions.
C. Deference
In Coeur Alaska , the Court explained that Congress had not "directly spoken" to the precise question in that case, and it looked "to the agencies' regulations construing [the statutory text], and [the Corps and] the EPA's subsequent interpretation of those regulations" to determine the answer to that question. 557 U.S. at 277, 129 S.Ct. 2458.
As Coeur Alaska recognized, agencies charged with administering a federal statute may interpret that statute **347 in ways that call for deference. See id. The agencies may promulgate rules after notice and comment. See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc. , 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984) ; *270 accord United States v. Mead Corp. , 533 U.S. 218, 226-27, 121 S. Ct. 2164, 150 L. Ed. 2d 292 (2001). Or they may engage in formal adjudication following notice and comment, which will also warrant Chevron deference. See Mead Corp. , 533 U.S. at 227, 121 S.Ct. 2164 (explaining that "[d]elegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking"); Charles H. Koch, Jr. and Richard Murphy, 4 Administrative Law & Practice § 11.34.10 (3d ed 2010) (recognizing "a safe harbor for Chevron deference where an agency uses notice and comment, formal adjudication, or similarly extensive procedures to develop the interpretation"). Additionally, the Court recently reaffirmed that an agency's reasonable interpretation of its own regulations will warrant deference. See Kisor v. Wilkie , 588 U.S. ----, 139 S. Ct. 2400, 2414-18, --- L. Ed. 2d ---- (2019) (listing the criteria for deferring to an agency's interpretation of its own regulations).[24] Finally, agency interpretations contained in opinion letters and the like are entitled to respect but only to the extent that they have the power to persuade. Christensen v. Harris County , 529 U.S. 576, 587, 120 S. Ct. 1655, 146 L. Ed. 2d 621 (2000) (citing Skidmore v. Swift & Co. , 323 U.S. 134, 140, 65 S. Ct. 161, 89 L. Ed. 124 (1944) ).
As explained above, the text of the Clean Water Act does not speak directly to the question whether discharges resulting from suction dredge mining constitute the "discharge of dredged *** material" subject to the Corps' permitting authority or the discharge of processed waste subject to the EPA's permitting authority. One would hardly expect Congress to have focused on such a small detail. Rather, that is precisely the sort of issue that ordinarily would be (and was) left to the EPA's and the Corps' application of the broader principles stated in the Clean Water Act.
**348 We also conclude that the regulations that those agencies have promulgated do not resolve that issue. The regulations expressly recognize that the act of processing dredged material can result in the discharge of a pollutant that requires a permit from the EPA under section 402 rather than the discharge of dredged material that requires a permit from the Corps under section 404. However, as explained above, the regulations do not resolve whether the discharges resulting from suction dredge mining constitute a pollutant subject to section 402 or dredged material subject to section 404. Both the statutes and the regulations are genuinely ambiguous on that question.
In our view, the most persuasive answer to that question lies in the general permits for suction dredge mining that the EPA has issued after notice and comment. Because the level of formality that attends the issuance of those permits bears on the deference due the EPA's interpretation, see Mead Corp. , 533 U.S. at 230, 121 S.Ct. 2164, we discuss that issue briefly. Congress has provided that the EPA may issue a permit for the discharge of a pollutant into the navigable waters of the United States only "after opportunity for a public hearing." 33 USC § 1342(a)(1). Consistently, the EPA's rules provide that the Regional Administrator of the EPA may issue an individual or a general permit only after providing notice and an opportunity for comment. See 40 CFR § 124.10 (requiring notice and an opportunity for comment); 40 CFR § 124.8 (requiring preparation of a fact sheet); 40 CFR § 124.17 (requiring a response to all significant comments as a prerequisite to the issuance of a final permit); 40 CFR § 122.28(b)(4) (providing that general permits are subject to the procedures in 40 CFR Part 124). Any person who filed comments on the draft permit or participated in a public hearing on the draft permit may petition for review to the Environmental Appeals Board. 40 CFR § 124.19 (a)(2). Only when the petition for review is finally resolved may the Regional Administrator issue a permit. 40 CFR § 124.19(l ).
As we read both the Clean Water Act and the EPA's rules, they require the opportunity for a hearing before the Regional Administrator following notice and comment and *271 provide for an appeal to the Environmental Appeals Board, **349 which serves as the arm of the Administrator of the EPA to ensure that the agency speaks with one voice. 40 CFR § 1.25(e) (defining the role of the Environmental Appeals Board).[25] Not only does the formality that attends the issuance of individual permits call for Chevron deference under Mead Corp. , but that is particularly true for the general permits that the EPA issues. General permits are not limited to discharges from a single point source, as an individual permit is; instead, they apply to multiple discharges resulting from an activity, such as suction dredge mining, that can occur across a wide geographic area. See 40 CFR § 122.2 (defining "general permit"). As such, general permits possess many if not more similarities with rules than they do individual adjudications.
As discussed above, the EPA has issued general permits for suction dredge mining in Alaska that were in force from 1994 to 2015, and it reissued a general permit for suction dredge mining in Idaho in 2018. Similarly, in extending a general permit for floating recovery devices in 2012 and again in 2017, the Corps agreed that "no Corps authorization is required" for the processed waste discharged as a result of small suction dredge mining. The Corps explained instead that those discharges are regulated by the Alaska Department of Environmental Conservation under section 402. All those permits, issued after notice and comment and an opportunity for a hearing, reaffirm the EPA's and the Corps' conclusion that the EPA is authorized under section 402 of the Clean Water Act to issue permits for the processed waste discharged as a result of suction dredge mining.
Not only do those permits possess a sufficient measure of formality to warrant Chevron deference, but the EPA's conclusion that it is authorized to permit discharges resulting from suction dredge mining and the Corps' acquiescence in that conclusion are reasonable. Cf. Coeur Alaska , 557 U.S. at 283, 129 S.Ct. 2458 (deferring to a similar issue that had been "addressed and resolved in a reasonable and coherent way by the practice and policy of the two agencies"); id. at 291, 129 S. Ct. 2458 (Breyer, J., concurring) (recognizing a "legal zone within **350 which the regulating agencies might reasonably classify material as 'dredged *** material' subject to § 404 *** or as a 'pollutant' subject to §§ 402 and 306"). As explained above, it is possible to classify the material discharged as a result of suction dredge mining as "dredged material" subject to the Corps' permitting authority. However, is it equally possible to classify the material discharged as a result of suction dredge mining as a "pollutant" that is subject to the EPA's permitting authority under section 402.
Petitioners argue, however, that the material discharged as a result of suction dredge mining is indistinguishable from the discharge of unprocessed dredged material over which the Corps has permitting authority. Both can remobilize heavy metals, such as mercury, and both can result in turbid wastewater plumes. As we understand petitioners' argument, they contend that it is arbitrary to classify the discharge resulting from suction dredge mining as anything other than "dredged material."[26] One difference, however, *272 between the two types of discharges is the cumulative impact of suction dredge mining. Unlike the discharge of dredged material, which often is project-specific, suction dredge mining is a recreational activity that numerous people can pursue simultaneously in the same or multiple locations. EPA, Response to Comments on Idaho Small Suction Dredge General Permit at 13 (explaining that the EPA deemed suction dredge mining as a "recreational activity," which numerous people can undertake). **351 In responding to similar objections to treating the discharge from suction dredge mining as a pollutant subject to section 402, the EPA has observed that suction dredging is " 'of special concern where it is frequent, persistent, and adds to similar effects caused by other human activities." Id. at 11 (quoting Bret C. Harvey and Thomas E. Lisle, Effects of Suction Dredging on Streams: a Review and an Evaluation Strategy 15 (Aug 1998)). In determining the extent to which suction dredge mining should be permitted, the EPA considers the total maximum density load of sediment that a stream is capable of handling. That varies depending on, among other things, the type of sediment where the suction dredge mining will be conducted, the extent to which a stream is already impaired by sediment, the rate of stream-flow, and the number of point sources-i.e. , suction dredge miners-discharging additional sediment into the stream. Id. at 26. The concern is not with the navigability of the water body, a concern that falls within the Corps' expertise; rather, the concern is with the health of the water body, a concern that lies at the heart of the EPA's expertise.
The Corps and the EPA reasonably could conclude that the EPA was better suited than the Corps to make those types of water quality decisions. The risks posed by the cumulative effects of multiple suction dredge mining operations on the overall health of a stream differ from the sort of engineering issues that the Corps typically addresses. See Nadia H. Dahab, Muddying the Waters of Clean Water Act Permitting: NEDC Reconsidered , 90 Or L Rev 335, 352-54 (2011) (discussing the EPA and the Corps' respective spheres of expertise). Specifically, the effect of increased sedimentation on water quality posed by multiple suction dredge mining operations requires the permitting agency to consider the number of permits that should be issued, the streams in which suction dredge mining should be permitted or limited, and the appropriate restrictions that should be included for each stream on the intensity, duration, and frequency of the activity.
Perhaps the Corps could have made those same kinds of water quality decisions. However, in light of the cumulative impact of sedimentation on water quality that **352 can result from suction dredge mining and in light of the need to include appropriate limits on the permits to maintain the health of affected water bodies, the Corps and the EPA reasonably could conclude, as they have, that permits for the discharge of material resulting from suction dredge mining should be issued by the EPA under section 402 rather than by the Corps under section 404. It follows, we think, that the general permits issued by the both the EPA and the Corps are reasonable agency interpretations of a statute following notice and comment procedures that warrant deference under Mead .[27]
We note alternatively that the EPA's and the Corps' resolution of this issue can be viewed as the agencies' interpretation of their own "genuinely ambiguous" regulations. As explained above, the regulations recognize that the act of processing dredged material can result in the discharge of "pollutants" that require a permit under section 402 rather than the discharge of "dredged material" that requires a permit under section 404. However, as explained above, the regulations *273 do not unambiguously answer the specific question in this case-whether the processed waste discharged as a result of suction dredge mining falls into the former or the latter category. See Kisor , 139 S. Ct. at 2415 (directing courts to consider "the text, structure, history, and purpose of a regulation" in determining whether it is genuinely ambiguous). We accordingly look to the agencies' interpretation of their regulations and conclude, for the reasons set out above, that their consistent conclusions come "within the bounds of reasonable interpretation." See id. at 2416 (internal quotation marks omitted). Moreover, their interpretation reflects the agencies' authoritative or official position. See id. As noted above, the Administrator of the EPA has delegated authority to issue general permits to the Regional Administrators, a decision that is subject to centralized **353 review by the Environmental Appeals Board. The agencies' interpretation also implicates their substantive expertise, as the Court recognized in Coeur Alaska . See Kisor , 139 S. Ct. at 2417 (listing that criterion); Coeur Alaska , 557 U.S. at 291-92, 129 S.Ct. 2458 (Breyer, J., concurring) (describing the Court's decision as deferring to the agencies' expertise). Finally, the agencies' interpretation reflects their fair and considered judgment. See Kisor , 139 S. Ct. at 2417-18. Their interpretation is not a convenient litigating position, a post-hoc rationalization, or a new interpretation that creates unfair surprise. See id.
Indeed, since entering into a memorandum of agreement in 1986, both the EPA and the Corps consistently have recognized that the processed waste discharged as a result of small suction dredge mining is a pollutant that requires a permit from the EPA under section 402 rather than dredged material that requires a permit under section 404. Even if deference to the agencies' formal interpretation of their regulations were not sufficient under Mead , the EPA and the Corps' consistent and reasonable interpretation of the regulations warrants deference under Kisor .[28]
Two other issues require mention. First, much of petitioners' opening brief focuses on evidentiary challenges to the factual premises underlying DEQ's issuance of the permit. The Court of Appeals, however, declined to exercise its discretion to consider petitioners' third assignment of error contending that DEQ's findings were not supported by substantial evidence. Petitioners have not argued that the Court of Appeals abused its discretion in making that decision, and it is unclear how much, if any, of petitioners' fact-specific challenges are properly before us. Beyond that, as we understand the legal question before us, it is whether the EPA and the Corps reasonably have concluded that the EPA (and by extension DEQ) has permitting authority under section 402 over discharges resulting from suction dredge mining. It is difficult to understand how the factual record developed in a state hearing somehow limits the Corps' and the EPA's interpretation of their own regulatory authority, as opposed to establishing the appropriate numeric, **354 geographic, and temporal limitations on suction dredge mining permitted in local rivers and streams.
Second, petitioners argue that the Court of Appeals erred in concluding that the single discharge resulting from suction dredge mining was subject to permits issued by both the Corps and the EPA (or its state delegate). In petitioners' view, only one agency had the authority to permit the discharge. Although petitioners do not cite Coeur Alaska in support of their argument, we note that that decision is consistent with their position. See Coeur Alaska , 557 U.S. at 286, 129 S.Ct. 2458 (agreeing that a "two-permit regime [for a single discharge] is contrary to the [Clean Water Act] and the regulations"); see also Dahab, Muddying the Waters of Clean Water Act Permitting , 90 Or L Rev at 354-56 (critiquing the two-permit reasoning in NEDC , 232 Or. App. at 644-45, 223 P.3d 1071 ).
We need not resolve that issue to decide this case. As explained above, we defer to the EPA's and the Corps' reasonable conclusion that the EPA (or its state delegate) has the *274 authority to issue a permit under section 402 for all the processed waste discharged as a result of suction dredge mining. Given the Corps' and the EPA's conclusion that the EPA has authority over that permitting decision, we need not decide whether those agencies could have divided permitting responsibility for a single discharge between them. To be sure, DEQ's 2010 permit may have been too narrow in that it applied to only part of the discharge resulting from suction dredge mining. However, petitioners do not challenge the 2010 permit on the ground that it is too narrow. Rather, they challenge it on the ground that it is too broad. In their view, the EPA did not have any permitting authority over discharges resulting from suction dredge mining. That argument is not well taken and provides no basis for reversing the Court of Appeals decision.
The decision of the Court of Appeals is affirmed.
Balmer, J., dissented and filed an opinion.

As noted, the part of the 2001 rule on which petitioners rely has been repealed. We hesitate to rely too heavily on that fact, however. Neither the 1986 memorandum of agreement or the Corps' 1990 guidelines letter on which the state relies are currently in force. And, as noted above, the Court relied on the principles stated in the 1986 memorandum in deciding Coeur Alaska in 2009.

Both rules stated that using mechanized earth-moving equipment to conduct certain dredging activities ordinarily will result in a regulable redeposit of dredged material. The two rules differed only in how they allocated the burden of proving or disproving whether activities that came within that general rule resulted in incidental fallback. Presumably for that reason, the preamble to the proposed 2000 rule remained relevant to explaining the final 2001 rule.

The explanation for the changes in the Federal Register focused almost completely on the Corps' decision to expand the definition of "discharge" to include incidental fallback. See 58 Fed Reg 45008-26 (Aug 25, 1993). More specifically, the discussion focused on when the incidental discharge of unprocessed dredged material would constitute a regulable discharge. See id.

In 1993, the Corps restated that agricultural exception one more time. 33 CFR § 323.2(d)(2)(ii) (1994). As restated, the exception provided that the discharge of dredged material does not include:
"activities that involve only the cutting or removing of vegetation above the ground (e.g., mowing, rotary cutting, and chainsawing) where the activity neither substantially disturbs the root system nor involves mechanized pushing, dragging, or other similar activities that redeposit excavated soil material."
Id. As before, the Corps explained that the reason for the exception was that the listed activities "would not cause either the addition or redeposition of dredged material." 58 Fed Reg 45017 (Aug 25, 1993).

Since that time, the responsibility for issuing permits for suction dredge mining has been delegated to Alaska's counterpart to Oregon's DEQ. While the Alaska counterpart has acted consistently with the EPA, we look primarily to the EPA's permitting decisions.

The Corps may issue a permit under section 404 only after notice and an opportunity for a public hearing. See 33 USC § 1344(a)(1) ; 33 CFR § 325.3.

In a 2017 notice stating that it was extending the permit until 2018, the Corps added:
"The Corps DOES NOT regulate the discharge or release of rocks and or sediment from a sluice box mounted on a recovery device. The sluice box discharge is regulated by the ADEC under a section 402 APDES permit."
(Capitalization in original.)

In 2009, the California imposed a temporary moratorium on all suction dredge mining, which was scheduled to sunset in 2016. See Rinehart , 1 Cal. 5th at 658, 206 Cal.Rptr.3d 571, 377 P.3d 818.

In Kisor , a majority of the Court joined in only part of Justice Kagan's opinion. See Kisor , 139 S. Ct. at 2424 (Roberts, C.J., concurring in part) (joining in Parts I, II-B, III-B, and IV of Justice Kagan's opinion). In discussing Kisor , we refer only to those parts of the decision that state the opinion for the Court.

As noted above, the Corps follows similar procedures in issuing permits under section 404. See 33 USC § 1344(a)(1) ; 33 CFR § 325.3.

The dissent starts from a similar but analytically separate premise in interpreting the regulations. It reasons that, if the act of processing dredged material consists only of only removing part of the dredged material and adds nothing to it, then the resulting discharge will necessarily be "dredged material." The dissent, however, never identifies the basis for that premise, other than its own intuitive sense of the matter. Certainly, nothing in the text of the regulations stands for that proposition. Indeed, the one regulation that addresses discharges resulting from processing dredged material points in precisely the opposite direction. That regulation excepts discharges of pollutants resulting from the onshore processing of dredged material extracted for a commercial use from the "discharge of dredged material," without regard to whether the processing consisted of removing part of the dredged material or adding something to it. Finally, the dissent's premise is contrary to over 30 years of the EPA's and the Corps' consistent interpretation of their rules that the discharge of placer mining waste (waste left over after minerals have been removed from dredged material) is the discharge of a pollutant that requires a permit from the EPA under section 402.

Both the EPA and the Corps are charged with implementing the Clean Water Act. Because both agencies have issued general permits after a formal adjudication recognizing that discharges from small suction devices are subject to a permit issued by the EPA (or its state delegate) under section 402, this case does not require us to decide whether only one agency's formal order would be sufficient under Mead . Cf. Proffitt v. FDIC , 200 F.3d 855, 860 (D.C. Cir. 2000) (explaining that when two agencies administer a statute, one agency's interpretation is not sufficient).

We would reach the same conclusion even if we viewed the agencies' actions less deferentially as a persuasive agency interpretation under Skidmore .