**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| IDAHO CONSERVATION LEAGUE, | No. 22-35978 |
| *Plaintiff-Appellee,* | D.C. No. 1:18-cv-00353-REP |
| v. | |
| SHANNON POE, | OPINION |
| *Defendant-Appellant*. | |

Appeal from the United States District Court
for the District of Idaho
Raymond Edward Patricco, Jr., Magistrate Judge, Presiding

Argued and Submitted October 5, 2023
Seattle, Washington

Filed November 20, 2023

Before: KIM McLANE WARDLAW and MILAN D. SMITH, JR., Circuit Judges, and ROBERT L. HINKLE,[*] District Judge.

Opinion by Judge Milan D. Smith, Jr.

---

[*] The Honorable Robert L. Hinkle, United States District Judge for the Northern District of Florida, sitting by designation.

## SUMMARY**

### Environmental Law

The panel affirmed the district court's grant of summary judgment in favor of the Idaho Conservation League in the League's action under the Clean Water Act against Shannon Poe, who engaged in instream suction dredge mining, a method of placer mining, in Idaho's South Fork Clearwater River without a National Pollutant Discharge Eliminating System permit.

The panel held that to establish a violation of the Clean Water Act's NPDES requirements, also referred to as Section 402 permitting, a plaintiff must prove that the defendant (1) discharged, i.e., added (2) a pollutant (3) to navigable waters (4) from (5) a point source. As to the first element, the panel held that Poe's suction dredge mining "added" a pollutant to the South Fork. The panel followed *Rybachek v. EPA*, 904 F.2d 1276 (9th Cir. 1990), which upheld Environmental Protection Agency regulations interpreting the Clean Water Act as prohibiting discharges from placer mining sluice boxes unless done in compliance with a Section 402 permit. In two subsequent cases, *S. Fla Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95 (2004), and *L.A. Cnty. Flood Control Dist. V. Nat. Res. Def. Council, Inc.*, 568 U.S. 78 (2013), the Supreme Court held that the transfer of polluted water from one location to another within the same waterbody did not constitute an "addition" of pollutants. Here, by contrast, Poe excavated

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

from the riverbed materials that were not already suspended in the water. The panel concluded that *Rybachek* was not "clearly irreconcilable" with *L.A. County* or *Miccosukee Tribe*'s holdings, and it therefore was still good law.

The panel further held that the processed material discharged from Poe's suction dredge mining was a pollutant, not dredged or fill material, and therefore required an NPDES permit under Section 402 of the Clean Water Act, rather than a permit from the Army Corps of Engineers under Section 404. Because the meaning of the Act and its implementing regulations was ambiguous, the panel deferred to the official joint conclusion of the EPA and the Corps.

---

## COUNSEL

Frank D. Garrison IV (argued), Pacific Legal Foundation, Arlington, Virginia; Damien M. Schiff, Pacific Legal Foundation, Sacramento, California; Danielle Bettencourt, Fairfield and Woods PC, Denver, Colorado; for Defendant-Appellant.

Bryan Hurlbutt (argued) and Laurence J. Lucas, Advocates for the West, Boise, Idaho, for Plaintiff-Appellee.

## OPINION

M. SMITH, Circuit Judge:

This appeal raises questions of statutory interpretation concerning the Clean Water Act (CWA), 33 U.S.C. § 1311(a). For several years, Shannon Poe engaged in instream suction dredge mining in Idaho's South Fork Clearwater River (the South Fork) without a National Pollutant Discharge Eliminating System (NPDES) permit. Plaintiff Idaho Conservation League (ICL) sued Poe, arguing that he violated the CWA each time he operated a suction dredge on the South Fork without an NPDES permit. Poe countered that (1) his suction dredge mining did not add pollutants to the South Fork and therefore did not require an NPDES permit, and (2) even if his suction dredge mining did add pollutants, those pollutants are "dredged" or "fill" material regulated exclusively pursuant to Section 404, not Section 402, of the CWA. The district court granted summary judgment to ICL. Poe appeals the judgment as to liability. We affirm.

## STATUTORY AND REGULATORY BACKGROUND

Congress enacted the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA "categorically prohibits any discharge of a pollutant from a point source without a permit." *Comm. to Save Mokelumne River v. E. Bay Mun. Util. Dist.*, 13 F.3d 305, 309 (9th Cir. 1993). "[D]ischarge of a pollutant" is defined as the "addition of any pollutant to navigable waters from any point source . . . ." 33 U.S.C. § 1362(12). The CWA defines "pollutant" broadly to include "dredged spoil," "solid waste," "rock," "sand," and "industrial . . . waste discharged into water." 33

U.S.C. § 1362(6). A point source is "any discernible, confined and discrete conveyance . . . ." 33 U.S.C. § 1362(14). Navigable waters are defined as "the waters of the United States . . . ." 33 U.S.C. § 1362(7). The CWA does not define what constitutes the "addition" of a pollutant. *See* 33 U.S.C. § 1362.

Before discharging any pollutant, one must obtain a permit from either the Environmental Protection Agency (the EPA) or the Army Corps of Engineers (the Corps). *See* 33 U.S.C. §§ 1311(a), 1342, 1344. The NPDES permitting program (also referred to as Section 402 permitting) authorizes the EPA to issue permits "for the discharge of any pollutant, or combination of pollutants," on the condition that the discharge will otherwise comply with the CWA. 33 U.S.C. § 1342(a)(1). Section 404 of the CWA authorizes the Corps to issue permits "for the discharge of dredged or fill material . . . ." 33 U.S.C. § 1344(a). When a discharge requires a Section 404 permit, it does not require a Section 402 permit. *See* 33 U.S.C. § 1342(a)(1); 40 C.F.R. § 122.3(b). The CWA does not define "discharge of dredged material" or "dredged material." *See* 33 U.S.C. §§ 1342, 1362.

## FACTUAL AND PROCEDURAL BACKGROUND

Suction dredge mining is a method of placer mining that uses a floating watercraft device with a pump to suck water, riverbed sands, and minerals through a nozzle. The water and riverbed material are run through a "sluice box," where gold and other heavy metals are separated out. Water, sand, and minerals are then discharged back into the river, along with sediments and other pollutants. Dredging creates tailing piles behind the dredge, where larger and heavier processed riverbed materials are discarded and settle to the

river bottom nearby. Tailing piles can rise to the surface level of the river and can span most of the river's width.

Dredging overburden and bedrock involves dismantling the riverbed by dislodging and moving rocks and boulders, and breaking up tightly bound sediments using the miner's hands, the dredge nozzle, and other tools, like crowbars. The resulting holes can be several feet deep under the riverbed.

During the 2014, 2015, and 2018 dredge seasons, Poe suction dredge mined forty-two days on the South Fork, a navigable water located in north-central Idaho. Poe never obtained an NPDES permit pursuant to Section 402 of the CWA.

On August 10, 2018, ICL sued Poe, alleging that Poe was violating the CWA by failing to obtain an NPDES permit while dredging and discharging sediment and other pollutants in the South Fork. On December 21, 2018, Poe filed a motion to dismiss arguing that (1) the district court lacked subject matter jurisdiction because, in part, ICL's 2017 and 2018 notice letters were not sent via certified mail as required by the CWA and its implementing regulations; and (2) ICL lacked standing to the bring the suit in the first instance. The district court denied the motion.

ICL then moved for summary judgment on liability. Poe cross-moved for summary judgment. On June 4, 2021, the district court granted summary judgment to ICL, concluding that (1) Poe's suction dredge mining added pollutants to the South Fork, thereby requiring an NPDES permit under Section 402 of the CWA; and (2) the processed material discharged from Poe's suction dredge mining was a pollutant, not dredged or fill material, requiring an NPDES permit under Section 402 of the CWA rather than a permit under Section 404. The court thereafter enjoined Poe from

suction dredge mining in the South Fork without a valid CWA Section 402 permit and imposed a $150,000 civil penalty.  Poe appeals the judgment as to liability.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1291.  We review de novo a district court's decision to grant summary judgment.  *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc).  We "must determine whether, viewing the evidence in the light most favorable to the nonmoving party, there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.*  Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

## ANALYSIS

### I.  Dumping Suction Dredge Mining Waste into the South Fork Is an "Addition" of Pollutants Pursuant to the CWA.

To establish a violation of the CWA's NPDES requirements, "a plaintiff must prove that defendant[] (1) discharged, i.e., added (2) a pollutant (3) to navigable waters (4) from (5) a point source."  *Comm. to Save Mokelumne River*, 13 F.3d at 308.  The parties dispute the first element— whether Poe's suction dredge mining "added" a pollutant to the South Fork.

What amounts to the "addition" of a pollutant is not defined under the CWA.  "It is well settled that the starting point for interpreting a statute is the language of the statute itself."  *Olympic Forest Coal. v. Coast Seafoods Co.*, 884 F.3d 901, 905 (9th Cir. 2018) (quoting *Gwaltney of*

*Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 56 (1987)).  "When interpreting a statute, we first use the 'traditional tools of statutory construction,' to determine whether Congress directly addressed the 'precise question at issue.'"  *Id.* (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984)).  "If the precise question at issue is addressed, then the 'unambiguously expressed intent of Congress controls.'"  *Id.* (quoting *Chevron*, 467 U.S. at 843).  Where a statute is ambiguous, courts defer to the reasonable interpretation of the agency charged with administering that statute.  *See Chevron*, 467 U.S. at 844.

Since the 1970s, the EPA has interpreted the CWA as prohibiting discharges from placer mining sluice boxes unless done in compliance with a Section 402 permit.  *See Trustees for Alaska v. EPA*, 749 F.2d 549, 552–53 (9th Cir. 1984) (reviewing the EPA's issuance of Section 402 permits to gold placer miners in 1976 and 1977).  In 1988, the EPA adopted industry-wide regulations setting effluent limitations for Section 402 permits for gold placer miners, including gold mining from floating dredges.  *See* 40 C.F.R. § 440.140.

In *Rybachek v. EPA*, 904 F.2d 1276 (9th Cir. 1990), miners challenged these regulations, arguing that placer mining does not cause the "addition" of a pollutant.  We rejected that argument.  We noted that "resuspension" of streambed materials "may be interpreted to be an addition of a pollutant under the Act," and we deferred to the EPA's reasonable interpretation that such activity constitutes the "addition" of a pollutant under the CWA.  *Id.* at 1285–86 (first citing *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 923 (5th Cir. 1983) (stating that "[t]he word 'addition,' as used in the definition of the term 'discharge,'

may reasonably be understood to include 'redeposit'"); and then citing *United States v. M.C.C. of Florida, Inc.*, 772 F.2d 1501, 1506 (11th Cir. 1985) (action of digging up sediment and redepositing it on sea bottom by boat propellers constitutes an addition of pollutants), *vacated and remanded on other grounds*, 481 U.S. 1034 (1987)).  We further explained: "Because the EPA has been charged with administering the [CWA], we must show great deference to the Agency's interpretation of the Act.  We especially defer where the Agency's decision on the meaning or reach of the [CWA] involves reconciling conflicting policies committed to the Agency's care and expertise under the Act."  *Id.* at 1284 (citation omitted).

Poe's mining activities fall squarely within the scope of *Rybachek*.  Undisputed evidence in the record, including photos and descriptions of Poe's dredge operating on the South Fork, shows that he "excavate[d] the dirt and gravel" in the river using a high-pressure blaster nozzle, "extract[ed] any gold" and other heavy metals, and "discharge[d] the dirt and other non-[heavy metal] materials into the water."  *See id.* at 1285.  That is, Poe engaged in placer mining "subject to regulation under the [CWA]."  *Id.*  Poe, therefore, "added" pollutants to the South Fork.  *See id.* ("[W]e will not strike down the EPA's finding that placer mining discharges pollutants within the meaning of the Act."); *see also Borden Ranch P'ship v. U.S. Army Corps of Engineers*, 261 F.3d 810, 814 (9th Cir. 2001) (reaffirming *Rybachek*, which "held that removing material from a stream bed, sifting out the gold, and returning the material to the stream bed was an 'addition' of a pollutant'"), *aff'd*, 537 U.S. 99 (2002).

In response, Poe argues that (1) *Rybachek* is no longer good law in light of subsequent Supreme Court decisions or, in the alternative, (2) the court should not apply *Chevron*

deference and overrule *Rybachek*. Neither argument is persuasive.

Poe suggests that the Supreme Court has, since *Rybachek*, twice confirmed the "commonsense interpretation" of the CWA—i.e., that a person does not illegally discharge a pollutant unless he or she adds new material from the outside world. *See S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95 (2004); *L.A. Cnty. Flood Control Dist. v. Nat. Res. Def. Council, Inc.*, 568 U.S. 78 (2013). That is, according to Poe, *Miccosukee Tribe* and *L.A. County* eviscerate the logic of *Rybachek*. But these cases are both distinguishable from *Rybachek* and inapposite here. In *Miccosukee Tribe*, polluted water was removed from a canal, transported through a pump station, and deposited into a reservoir a short distance away. *See* 541 U.S. at 98–99. The Court held that pumping polluted water from, and back into, the same body of water, without more, "cannot constitute an 'addition' of pollutants." *Id.* at 109–10 ("As the Second Circuit put it in *Trout Unlimited*, if one takes a ladle of soup from a pot, lifts it above the pot, and pours it back into the pot, one has not 'added' soup or anything else to the pot." (citing *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of N.Y.*, 273 F.3d 481, 492 (2d Cir. 2001) (cleaned up)). In *L.A. County*, the Court held that "the flow of water from an improved portion of a navigable waterway into an unimproved portion of the very same waterway does not qualify as a discharge of pollutants under the CWA." 568 U.S. at 83. In both cases, polluted water was transferred from one location to another within the same waterbody.

Here, by contrast, Poe excavated rocks, gravel, sand, sediment, and silt from the riverbed. Poe punched holes in the riverbed by excavating through layers of riverbed down

to the bedrock.  Poe then processed the materials by running them through the sluice on his dredge, and then discarded the waste material into the water.  This added a plume of turbid wastewater to the South Fork.  These materials were not already suspended in the water; they were previously deposited in the riverbed.  Poe's dredging was therefore not simple water transfer.

As the district court correctly observed,

> Poe's reliance on [*L.A. County* and *Miccosukee Tribe*] misses the point.  Suction dredge mining does not simply transfer water (what the above cases address); to the contrary, it excavates rock, gravel, sand, and sediment from the riverbed and then *adds* those materials back to the river—this time, in suspended form.

*See also* EPA, 2018 Response to Comments Idaho Small Suction Dredge General Permit (GP) ("If, during suction dredging, only water was picked up and placed back within the same waterbody . . . , no permit would be necessary.  However, in suction dredging, bed material is also picked up with water.  Picking up the bed material is in fact the very purpose of suction dredging—the bed material is processed to produce gold.  This process is an intervening use that causes the addition of pollutants [rock and sand, see CWA § 502(6)] to be discharged to waters of the United States.  As a result . . . an NPDES permit is required for the discharge from this activity."  (alteration in original) (citation omitted)).  Thus, *Miccosukee Tribe* and *L.A. County* do not disturb our holding in *Rybachek*, which remains good law.

In addition, or in the alternative, Poe asks us not to apply *Chevron* deference and to overrule *Rybachek*. Specifically, Poe argues that (1) the ordinary meaning of "addition" under the CWA is clear, making *Chevron* deference inappropriate, (2) *Chevron* should not be applied where a statute may subject individuals to criminal penalties, and (3) *Chevron* should not be applied where the EPA has taken inconsistent positions on the meaning of "addition" under the CWA. Adopting any of these theories would require us to depart from our ruling in *Rybachek*. A three-judge panel may depart from controlling circuit precedent only if "our prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority." *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc). "[T]he 'clearly irreconcilable' requirement 'is a high standard.'" *Fed. Trade Comm'n v. Consumer Def., LLC*, 926 F.3d 1208, 1213 (9th Cir. 2019) (quoting *Rodriguez v. AT&T Mobility Servs. LLC*, 728 F.3d 975, 979 (9th Cir. 2013)). "[I]f we can apply our precedent consistently with that of the higher authority, we must do so." *Id.*

As explained above, *Rybachek*'s holding regarding placer mining is not irreconcilable, let alone "clearly irreconcilable," with *L.A. County* or *Miccosukee Tribe*'s holdings regarding the transfer of water within a single waterbody. We therefore follow *Rybachek* on the issues raised by Poe and hold that Poe's instream suction dredge mining constitutes the "addition" of a pollutant under the CWA.

## II. The Processed Material Discharged from Instream Suction Dredge Mining is a Pollutant that Requires a Section 402 Permit.

Poe also argues that, even if his suction dredge mining adds pollutants to the South Fork, the waste discharged from his operation constitutes "dredged" or "fill material" over which the Corps has exclusive permitting authority.[1]  Poe makes this argument pursuant to (1) the ordinary meaning of "dredged material" under the CWA and (2) the ordinary meaning of the Corps' own regulatory definition of "dredged material."  Neither argument is persuasive.

Under the CWA, pollution discharges require a Section 402 permit from the EPA, unless the discharge is "dredged or fill material" requiring a Section 404 permit from the Corps.  *See* 33 U.S.C. §§ 1342, 1344; 40 C.F.R. § 122.3; *Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261, 274 (2009).  The terms "dredged material" and "discharge of dredged material" are not defined under the CWA.  *See* 33 U.S.C. § 1362; *Olympic Forest Coal.*, 884 F.3d at 905 ("It is well settled that the starting point for interpreting a statute is the language of the statute itself.").  Nor does the statute define whether material that is dredged from navigable water remains "dredged material" after it has been processed.  That is, nothing in the CWA says that once a material has been dredged, it remains a dredged material forever.  If, as the district court explained (citing *EOMA*, 445

---

[1] The Oregon Supreme Court recently addressed this issue.  *See E. Or. Mining Ass'n v. Dep't of Env't Quality*, 445 P.3d 251, 274 (2019) (*EOMA*) (deferring to the "EPA's and the Corps' reasonable conclusion that the EPA (or its state delegate) has the authority to issue a permit under section 402 for all the processed waste discharged as a result of suction dredge mining").  We find *EOMA* well-reasoned and persuasive and substantially follow its analysis, as did the district court.

P.3d 251, 257 (2019)), processing dredged material can change its character, the text of the statute does not identify the point at which the processed material becomes a pollutant other than dredged material that is subject to the EPA's rather than the Corps' permitting authority. The CWA therefore does not, in plain terms, address the question presented here.

We next look to the regulations promulgated to implement the Act. *See Coeur Alaska*, 557 U.S. at 277–78 (explaining that, if the text of the CWA is ambiguous, courts look to the agencies' implementing regulations and, if those regulations are ambiguous, to the agencies' interpretation and application of their regulations to determine what the CWA means)). The CWA regulations define "dredged material" as "material that is excavated and dredged from waters of the United States," but offer no further explanation of the term. *See* 33 C.F.R. § 323.2(c). Like the CWA, the regulations do not specifically address the question of which agency has the authority to permit the discharge of dredged material that has been processed, such as the leftover waste material that is discharged during suction dredge mining.

Absent clear direction from either the CWA or the regulations promulgated thereunder, we look to the agencies' interpretation and application of those regulations. *See Coeur Alaska*, 557 U.S. at 277–78; *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415–18 (2019). The EPA and Corps have long agreed that when materials are dredged from a waterbody and are subsequently processed, they are no longer dredged materials and have become industrial waste, rock, sand, or other CWA pollutants regulated under Section 402.[2]   For

---

[2] The district court included a more detailed account of the regulatory history, which Poe does not contest on appeal.

example, in their 1986 memorandum of agreement, the EPA and the Corps agreed that "placer mining wastes" were the type of "pollutant" discharged in "liquid, semi-liquid, or suspended form" subject to Section 402, not Section 404. Memorandum of Agreement Concerning Regulation of Discharge of Solid Waste Under the Clean Water Act, 51 Fed. Reg. 8871, 8872 (March 14, 1986). A 1990 Regulatory Guidance Letter from the Corps states that once "dredged material" is "subsequently processed to remove desired elements, its nature has been changed" and "it is no longer dredged material" regulated under Section 404. U.S. Army Corps of Engineers, *Regulation of Waste Disposal from In-Stream Place Mining*, Regulatory Guidance Letter 88-10 (July 28, 1990), https://usace.contentdm.oclc.org/utils/getfile/collection/p16 021coll9/id/1386; *see also* U.S. Army Corps of Engineers, *Regulatory Guidance Letters*, https://www.usace.army.mil/Missions/Civil-Works/Regulatory-Program-and-Permits/Guidance-Letters (noting that, "unless superseded by specific provisions of subsequently issued regulations or guidance, the content provided in [Regulatory Guidance Letters] generally remains valid after the expiration date"). The Corps explained: "The raw materials associated with placer mining operations are not being excavated simply to change their locations as in a normal dredging operation, but rather to obtain materials for processing, and the residue of this processing should be considered waste."

As the district court noted, "whatever patchwork of permitting authority has existed over time, from *at least 2013* (via the general permitting process, initiated in 2010 and after notice and comment), it is *the EPA* that has required a Section 402 permit for suction dredge mining." "This fact,

coupled with the overall approach to and assignment and acceptance of responsibilities under the EPA's and the Corps' interpretation of the applicable regulations to suction dredge mining . . . , confirms that the agencies have taken an official position and made a fair and considered judgment, based on its substantive expertise, that the operation of a suction dredge results in the discharge of processed wastes, thus requiring Section 402 permits." We therefore defer to the agencies' reasonable interpretation of the CWA and implementing regulations that the processed material discharged from Poe's suction dredge mining is a pollutant, not a dredged or fill material, and requires an NPDES permit under Section 402 of the CWA. *See Kisor*, 139 S. Ct. 2400.

Poe's arguments to the contrary are unavailing. Principally, citing the dissent in *EOMA*, Poe argues that (1) the text of Section 404 itself is enough to settle the case: suction dredge mining does "dredge" material, and, in a literal sense, that material is then "discharged" into the water, and (2) the Corps' regulation defining "dredged material" is not genuinely ambiguous as to the question over whether instream suction dredge mining is regulated under Section 404 once ordinary interpretive methods have been applied. However, as explained above, even if the material starts as dredged material, that fact does not settle the issue of whether material that was dredged remains "dredged material" after it has been processed. Poe processed the materials dredged from the riverbed when he ran them through the sluice on his dredge, extracted heavy metals and other materials, and discharged the remaining waste and sediments into the South Fork.

In any event, the meaning of the CWA and implementing regulations remains sufficiently ambiguous that deference to the agencies' official joint conclusion is appropriate. *See*

*Coeur Alaska*, 557 U.S. at 277–78. As the Oregon Supreme Court noted, "[b]oth the statutes and the regulations are genuinely ambiguous on [this] question." *EOMA*, 445 P.3d at 270. The concern here "is not with the navigability of the water body, a concern that falls within the Corps' expertise; rather, the concern is with the health of the water body, a concern that lies at the heart of the EPA's expertise. The Corps and the EPA reasonably could conclude that the EPA was better suited than the Corps to make th[e]se types of water quality decisions." *Id.* at 272.

## CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment to ICL is **AFFIRMED**.