514            May 3, 2021            No. 23

IN THE OREGON TAX COURT
REGULAR DIVISION

HEALTH NET LIFE INSURANCE COMPANY,
*Plaintiff,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant.*

(TC 5371)

On cross-motions for summary judgment, Plaintiff argued that the minimum corporation excise tax under ORS 317.090 is preempted by 42 USC section 1395w-24(g), when applied to Medicare Advantage (MA) organizations. Defendant Department of Revenue (the department) argued that ORS 317.090 is not preempted because the tax imposed is not a "premium tax" imposed exclusively on gross premiums received by insurers. Applying federal statutory interpretation principles, Oregon's minimum tax is a premium tax as applied to MA organizations because it is "imposed, directly or indirectly," "on direct premiums," not on net income. Because Congress had clearly expressed its intention to exempt MA organizations from such a tax, the tax under ORS 317.090 is preempted by 42 USC section 1395w-24(g).

Oral argument on cross-motions for summary judgment was held March 9, 2020, in the courtroom of the Oregon Tax Court, Salem.

Gregg D. Barton, Perkins Coie LLP, Seattle, filed the motion and argued the cause for Plaintiff.

Darren Weirnick, Senior Assistant Attorney General, Department of Justice, Salem, filed the cross-motion and argued the cause for Defendant.

Decision for Plaintiff rendered May 3, 2021.

**ROBERT T. MANICKE, Judge.**

On cross-motions for summary judgment, the parties ask the court to determine whether federal law preempts imposition of Oregon's minimum tax on corporations under ORS 317.090.[1] The facts are stipulated.

---

[1] Unless otherwise noted, all references to the Oregon Revised Statutes (ORS) are to the 2017 edition.

## I.  FACTS

At all relevant times, Plaintiff (taxpayer) was a "Medicare Advantage" (MA) health plan provider operating in Oregon.[2] As an "MA organization" under 42 USC section 1395w-28(a)(1),[3] taxpayer provided "health benefit coverage to MA eligible members."[4] In exchange, taxpayer received payments pursuant to 42 USC section 1395w-23 from the Centers for Medicare & Medicaid Services (CMS), a part of the federal Department of Health and Human Services (DHHS). Taxpayer also received premiums from enrollees to whom it provided benefits.

Taxpayer was an "insurer" under ORS 317.010(11) and was required to file returns under ORS 317.650. On or about September 13, 2017, taxpayer made an estimated tax payment of $100,000 to Defendant Department of Revenue (the department). On or about March 29, 2018, taxpayer filed an original Oregon Insurance Excise Tax Return (Form OR-20-INS) for 2017 on which it reported an Oregon taxable loss and claimed it owed only the minimum tax of $150. Taxpayer made a $150 payment on or about April 3, 2018.[5] On June 8, 2018, the department sent taxpayer a notice of deficiency that adjusted taxpayer's minimum tax liability under ORS 317.090 to $100,000 and imposed $812 of interest, resulting in a net balance due of $662.

Taxpayer paid the $662 within 30 days of receiving the notice and, on or about February 6, 2019, filed an amended Form OR-20-INS for 2017 on which it claimed a $100,662 refund. In a memorandum attached to its amended return, taxpayer asserted that 42 CFR section 422.404

---

[2] Taxpayer also operates outside of Oregon. Taxpayer's apportionment of income is not an issue in this case.

[3] All references to the United States Code (USC) and the Code of Federal Regulations (CFR) are to the 2017 editions unless otherwise noted.

[4] The court understands the stipulated term "members" to refer to individuals to whom taxpayer provides health insurance as an MA organization. Certain exhibits refer to "enrollees" and "beneficiaries." For purposes of this order, the court understands these terms to be interchangeable with "members."

[5] The department points out, and taxpayer does not dispute, that taxpayer's original return neglected to report that taxpayer had previously made the estimated tax payment of $100,000. This fact is not material to this order, except to explain why taxpayer paid the additional $150 when it did.

preempted imposition of Oregon's minimum tax on the amounts taxpayer received from CMS and MA enrollees. Taxpayer explained that, despite its name, substantially all of its Oregon premiums ($324,156,271 out of $324,160,186) were from CMS and enrollees; the remaining $3,915 consisting of life insurance premiums.[6] The department denied taxpayer's refund claim. Taxpayer timely appealed.[7] The parties have cross-moved for summary judgment as to whether the minimum tax under ORS 317.090, as applied to MA organizations, is preempted by 42 USC section 1395w-24(g) (the MA Preemption Statute) (text reprinted below and in Appendix).

## II.   BACKGROUND ON THE OREGON TAX

ORS 317.070 imposes an annual "excise tax" on every corporation "for the privilege of carrying on or doing business *** within this state." *See also* ORS 317.010(5) (defining "excise tax" as a "tax measured by or according to net income imposed upon *** business corporations for the privilege of carrying on or doing business in this state"). The excise tax is measured by the corporation's "Oregon taxable income." ORS 317.070.

For most corporations, the starting point to determine "Oregon taxable income" is "taxable income" as determined under federal income tax law. *See* ORS 317.010(8), ORS 317.010(10). However, Oregon applies industry-specific tax laws to insurers. First, ORS 317.655(1) provides a unique definition of "Oregon taxable income":

"For purposes of the tax imposed under ORS 317.070, the Oregon taxable income of an insurer shall be the insurer's 'net gain from operations' or 'net income' determined in the manner prescribed by the Department of Consumer and Business Services on its Annual Statement Form for

---

[6] The record does not state the portion of $324,156,271 attributable to payments made by enrollees or payments made by CMS.

[7] The department originally denied that taxpayer "'timely' sought the refund that resulted in th[e February 28, 2019, Notice of Proposed Refund Adjustment]." Although the department denied that taxpayer timely appealed the "assessed deficiency within the time required under ORS 305.265(14) and ORS 305.280(3)," the department concedes that taxpayer's "First Amended Complaint may be treated as a timely appeal of the department's earlier assessment as provided in ORS 305.280(3)."

the taxable year, as adjusted pursuant to ORS 317.010(11),
317.122 and 317.650 to 317.665."

Unlike other corporations, therefore, an insurer uses as its
starting point "net income" as determined for purposes of
reporting to the Department of Consumer and Business
Services (DCBS). "Net income" for DCBS reporting purposes
includes premiums and certain annuity considerations, net
investment income, fees from investment management, and
certain other specified items, less specified expenditures.
The excise tax law then requires various adjustments to
net income, including the addition of any realized gains
and losses on the sale or exchange of property. *See* ORS
317.655(2).

After any adjustments, an insurer doing business
in more than one state must apportion its "net income" to
arrive at "Oregon taxable income." To do so, the insurer mul-
tiplies its net income by the "insurance sales factor." ORS
317.660(1)(a).

"The insurance sales factor shall consist of a fraction,
the numerator of which is the amount of direct premiums
(excluding reinsurance accepted and without deduction of
reinsurance ceded) received or earned by the insurer during
the tax year on policies and contracts that are allocated to
this state and to other jurisdictions in which the insurer
is not authorized to do business, and the denominator of
which is the total of such premiums received or earned by
the insurer during the tax year on policies and contracts
that had been sold within and without this state."

ORS 317.660(1)(b). "Premiums" is defined as follows:

"*'Premiums' means sums properly included in those
schedules of the annual statement filed by the insurer with
the Director of the Department of Consumer and Business
Services that appropriately allocate premiums by jurisdic-
tion.* If the exclusion of reinsurance premiums results in
an insurance sales factor that does not fairly represent the
extent of the taxpayer's activity in this state, the taxpayer
may petition for and the Department of Revenue may per-
mit, or the Department of Revenue may require, the inclu-
sion of reinsurance premiums in the insurance sales fac-
tor. If the annual statement of the insurer does not report

received premiums then the insurance sales factor shall be determined based on earned premiums."

ORS 317.660(2)(b) (emphasis added). In sum, for an insurer that operates both in Oregon and other jurisdictions, "Oregon taxable income" is determined annually by multiplying the insurer's "net income" (after specified adjustments) by a fraction, the numerator of which consists of Oregon direct premiums (plus direct premiums from "jurisdictions in which the insurer is not authorized to do business") and the denominator of which consists of all direct premiums.

ORS 317.710(1) imposes the requirement that each corporation file an excise tax return. Some analysis typically is required to determine whether a corporation must join in a consolidated return or file separately; rules under subsections (2) through (5) govern that analysis. However, in the case of an insurer, subsection (7) requires each insurer to file a separate return; no insurer may be included in a consolidated excise tax return.

ORS 317.090(2) imposes a "minimum tax," for the "privilege of carrying on or doing business" in Oregon, measured as a dollar amount of tax applied to specified tiers of "Oregon sales." The amount of the tax ranges from $150 (if Oregon sales are less than $500,000) to $100,000 (if Oregon sales are $100 million or more). The minimum tax is an exception to the excise tax. *See* ORS 317.070 ("[E]very \*\*\* business corporation \*\*\* doing business within this state, *except as provided in \*\*\* ORS 317.090*, shall annually pay to this state, for the privilege of carrying on or doing business by it within this state, an excise tax according to or measured by its Oregon taxable income \*\*\*." (Emphasis added.)).

ORS 317.090(1) defines "Oregon sales" by reference to whether the corporation apportions its income pursuant to Oregon's version of the Uniform Division of Income for Tax Purposes Act under ORS 314.650 to 314.665 (UDITPA). If the corporation apportions income under UDITPA (or if the corporation would apportion under UDITPA if it had sales in more than one state (*see* ORS 317.090(1)(a)(B))), "Oregon sales" means total "sales" in Oregon during the tax year as defined in UDITPA. ORS 317.090(1)(a). Under the version

of UDITPA in effect for the tax year at issue, "sales" generally included all gross receipts except those required to be allocated to a specific state, as well as the net gain from certain intangible assets. *See former* ORS 314.610(7) (2015); *former* ORS 314.665(6) (2015); Or Laws 2017, ch 622 (amending UDITPA provisions for tax years beginning on or after January 1, 2018).[8] For all other corporations, ORS 317.090 (1)(a)(C) authorizes the department to define "Oregon sales" by administrative rule. The department has adopted an administrative rule containing specific definitions of "Oregon sales" for 14 categories of corporations that do not apportion income under UDITPA, in each case defining "Oregon sales" for minimum tax purposes by reference to the numerator of the sales factor as defined for apportionment purposes under an existing rule or statute. *See* OAR 150-317-0170(4)(a) to (n). Those categories include insurers, public utilities, and financial organizations (which are excluded from UDITPA by ORS 314.615 and are instead subject to apportionment under ORS 314.280), interstate broadcasters subject to ORS 314.680 to 314.690, and others. *See* ORS 314.615. As relevant here, the rule states: "'Oregon sales' means the numerator of the sales factor for *** [i]nsurers (as defined in ORS 317.010(11)), as provided in ORS 317.660(1) ***." OAR 150-317-0170(4)(m). Therefore, under the department's rule, the amount of an insurer's tax under ORS 317.090 is measured by the amount of "direct premiums *** received or earned by the insurer during the tax year on policies and contracts that are allocated to this state and to other jurisdictions in which the insurer is not authorized to do business."

## III.   ISSUE

Does the MA Preemption Statute prohibit the department from imposing the tax under ORS 317.090 on taxpayer, an MA organization?

## IV.   ANALYSIS

When interpreting a federal statute, the overall task of the court is to "identify and carry out the intent of

---

[8] The 2017 edition of the ORS does not reprint the version of the sales factor statute (ORS 314.665) that was in effect for tax years ending before January 1, 2018, which includes the period at issue in this case.

Congress when it enacted the statute in question." *Julian v. Dept. of Rev.*, 339 Or 232, 235, 118 P3d 798 (2005). Under the Supremacy Clause of the United States Constitution, federal laws preempt conflicting state laws. US Const, Art VI, § 2. However, "[i]n recognition of a state's power to tax in the absence of conflicting federal authority, federal law requires this court to read narrowly any federal exemptions preempting a state's power to tax, to avoid recognizing an exemption from state taxation that Congress did not express clearly." *Julian*, 339 Or at 235 (holding that federal Amtrak Act preempted Oregon personal tax on compensation of interstate truck driver).

Under federal principles of statutory interpretation, courts consider a statute's text, structure, and legislative history. *See Etter v. Dept. of Rev.*, 360 Or 46, 52, 377 P3d 561 (2016) (holding that 49 USC section 40116(f) did not preempt Oregon personal income tax on compensation of air carrier employee).[9] If Congress's intent as to the specific issue remains unclear after that analysis, courts must defer to an agency regulation that resolves the statutory ambiguity if the regulation was promulgated in the exercise of Congress's delegation of authority to the agency generally to make rules carrying the force of law, and the regulation is based on a permissible construction of the statute. *See United States v. Mead Corp.*, 533 US 218, 226-27, 121 S Ct 2164, 150 L Ed 2d 292 (2001); *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 US 837, 842-45, 104 S Ct 2778, 81 L Ed 2d 694 (1984); *Friends of the Columbia River Gorge, Inc.*, 346 Or at 378 (explaining that Oregon courts must apply *Chevron* deference when interpreting federal statutes "if the federal interpretative methodology so demands"). Finally, an "agency's reasonable interpretations of its own regulations will warrant deference" if certain criteria apply. *Eastern Oregon Mining Assoc. v. DEQ*, 365 Or 313, 347, 445 P3d 251 (2019); *see id*. at 352-53 (applying criteria in *Kisor*

---

[9] The Oregon Supreme Court also has described Oregon's method of interpreting a federal statute as an examination of the statute's "text, context, and legislative history." *Friends of the Columbia River Gorge, Inc. v. Columbia River Gorge Comm'n*, 346 Or 366, 378, 213 P3d 1164 (2009) (citing *Corp. of Presiding Bishop v. City of West Linn*, 338 Or 453, 463, 111 P3d 1123 (2005)). The court understands "context" and "structure" to refer to similar subjects of analysis, including related statutes.

*v. Wilkie*, 588 US \_\_\_, 139 S Ct 2400, 2414-18, 204 L Ed 2d 841 (2019)).

A.  *Text*

The MA Preemption Statute states:

"No State may impose a premium tax or similar tax with respect to payments to [MA] Organizations under section 1395w-23 of this title or premiums paid to such organizations under this part."[10]

42 USC § 1395w-24(g). The parties dispute the plain meaning of the phrase "premium tax," which the statute does not define. Generally, when interpreting text, the job of a court "is to interpret the words consistent with their 'ordinary meaning . . . at the time Congress enacted the statute.'" *Wisconsin Central Ltd. v. U.S.*, \_\_\_ US \_\_\_, 138 S Ct 2067, 2070-71, 201 L Ed 2d 490 (2018) (ellipsis in original) (quoting *Perrin v. United States*, 444 US 37, 42, 100 S Ct 311, 62 L Ed 2d 199 (1979)).

For the plain meaning of terms, the court turns, at least initially, to contemporaneous dictionaries, in this case, dictionaries in existence in 1997.[11] *Cf. id.* (interpreting plain meaning of "money remuneration" by reference to contemporaneous dictionaries). "Premium tax" was not defined in the contemporaneous edition of *Webster's Third New Int'l Dictionary* (unabridged ed 1993).[12] *Black's Law Dictionary* defined "premium tax": "Tax paid by insurer on gross insurance premiums sold in state." *Black's Law Dictionary* 1181 (6th ed 1990). The parties agree that a tax imposed on gross

---

[10] The referenced "part" is 42 USC, chapter 7, subchapter XVIII, Part C, which consists of 42 USC sections 1395w-21 through 1395w-28. "Payments to [MA] Organizations under section 1395w-23 of this title" refers to the monthly payments that the Secretary of DHHS (the secretary) makes to MA organizations "with respect to coverage of an individual" under the Medicare Advantage program. *See* 42 USC § 1395w-23(a)(1)(A).

[11] As discussed below, the phrase "premium tax or similar tax" appeared in the predecessor of the MA Preemption Statute enacted as part of the Balanced Budget Act of 1997 (reprinted in relevant part below). *See* Pub L 105-33, § 1854(g), 111 Stat 312 (codified as 42 USC § 1395w-24(g)). With respect to preemption, the court agrees with the department that the "2003 amendment did not change the meaning of 'premium tax or similar tax' adopted in 1997 or shed further light on the meaning of that phrase."

[12] Nor did a definition appear in the 1997 edition of *West's Tax Law Dictionary*.

premiums received by insurers is a premium tax. The term "premium" is not at issue, as neither party has sought to distinguish the two sources of taxpayer's receipts with respect to the Medicare Advantage program—payments from enrollees, as opposed to payments from CMS. Yet this definition does not resolve the preemption issue. The department argues in its motion that the *Black's* definition of "premium tax" implies that a tax is a premium tax only if it is imposed *exclusively* on gross premiums received by insurers, and that a tax that also is imposed on other kinds of receipts or other kinds of taxpayers is outside the definition and is thus not preempted: "[A] premium tax, being a tax on insurance premiums, is peculiar to, or exclusively imposed upon, insurance companies with respect to those premiums." Taxpayer in its response disagrees: "We disagree with the department's contention that exclusivity is a feature." The court concludes that the dictionary definition alone does not resolve whether Oregon's tax is a "premium tax" because the definition simply does not specify whether the tax must apply exclusively in any respect, whether exclusively to premiums, exclusively to insurers, or to both.

The parties also disagree as to the plain meaning of the undefined term "similar." The contemporaneous definition in *Webster's* is, in pertinent part:

> "**1 :** having characteristics in common : very much alike : COMPARABLE <for shaping slots, keyways . . . or [similar] cuts –H.D. Burghardt & Aaron Axelrod> <instruction for children in daily ethics, religion . . . and [similar] subjects –S.P. Chase & J.K. Snyder> <extremists of the right – so [similar] in so many ways to the extremists of the left –J.B. Oakes> **2 :** alike in substance or essentials : CORRESPONDING <no two animal habitats are exactly [similar] –W.H. Dowdeswell>[.]"

*Webster's* at 2120 (bold text and ellipses in original). Taxpayer argues that a tax is similar to a premium tax if it "exhibit[s] the essential characteristic of a premium tax—a tax on gross receipts and not net income." The department argues that, in the context of this case, the fact that the tax under ORS 317.090 is imposed on gross receipts is not sufficient to make the tax similar to a "premium tax": "A 'similar tax' must take its meaning from 'premium tax'

as a tax that is 'alike in substance or essentials' to a premium tax, not merely 'having characteristics in common.'" "[A]pplying the *noscitur a sociis* canon, it is clear that Congress intended 'similar tax' to take its meaning from 'premium tax' as a tax that is 'alike in substance or essentials' to a premium tax." The department thus relies on its premise that a "premium tax" must be imposed exclusively on gross premiums and exclusively on insurers; from there, it asserts: "For example, calling a tax imposed exclusively on insurers' gross premiums something else, such as a special excise or privilege tax on insurers, would be a 'similar tax.'"

Even if the court were to accept the department's definition of "premium tax," the court must conclude that the department's understanding of "similar" misses the mark: A tax that is a premium tax in operation but is called something else *is* a premium tax. *Cf. Hunt-Wesson, Inc. v. Franchise Tax Bd. of Cal.*, 528 US 458, 464, 120 S Ct 1022, 145 L Ed 2d 974 (2000) ("[A]s this Court once put the matter, a 'tax on sleeping measured by the number of pairs of shoes you have in your closet is a tax on shoes.'" (Quoting *Trinova Corp. v. Michigan Dept. of Treasury*, 498 US 358, 374, 111 S Ct 818, 112 L Ed 2d 884 (1991).)). To give effect to all of the words in the statute, "similar tax" must refer to taxes that are not premium taxes but that share some of the characteristics, substance, or essentials of a premium tax. The text of the MA Preemption Statute does not, however, specify the characteristics that Congress considered relevant in assessing similarity.

The court concludes that the plain meaning of the key terms in the statutory text, "premium tax" and "similar," remains ambiguous as applied in this case. *Cf. Group Health Cooperative v. Department of Revenue*, 8 Wash App 2d 210, 220, 438 P3d 158 (2019) (concluding that Washington business and occupation tax was "similar" to a premium tax "under the plain language of 42 USC section 1395w 24(g)").

B.    *Structure, Legislative History, and Agency Interpretations*

Both parties refer to an earlier preemption provision, and associated legislative history and agency interpretations, adopted as part of the Federal Employees Health Benefits Program (FEHBP). For ease of reference, and

before further analysis, the court sets forth a chronology of the development of the relevant text, legislative history, and agency interpretations of the preemption provisions applicable to the FEHBP (1990), as well as the "Medicare+Choice" (M+C) program (1997) and M+C's successor program, Medicare Advantage (2003).

1.  *The FEHBP*

The FEHBP is a group health insurance program, enacted in 1959, that covers current and retired employees of the federal government and their family members. Pub L 86-382, 73 Stat 708-717 (1959); *see Travelers Insurance Co. v. Cuomo*, 14 F3d 708, 711-12 (2d Cir 1993) (citing 5 USC § 8902). It is sponsored by the federal government as employer, which enters into contracts with insurers to provide health care coverage to enrollees:

> "Under [Federal Employees Health Benefits Act (FEHBA)], the United States does not act as an insurer, but, through the Office of Personnel Management ('OPM'), contracts with various insurance carriers to develop health care plans with varying coverages and costs. 5 USC § 8902. Prospective enrollees can select coverage from any one of the participating carriers in their region. 5 USC § 8905."

*Travelers Insurance*, 14 F3d at 711-12. The federal government pays the insurers from a fund consisting of government contributions and contributions the government collects from employees, generally through payroll withholding. *See* 5 USC § 8909(a) (establishing fund); *id.* § 8906 (providing for contributions to the fund).

In 1990, Congress added a preemption provision (the "FEHBP Preemption Statute") that states:

> "(1)  No tax, fee, or other monetary payment may be imposed, directly or indirectly, on a carrier or an underwriting or plan administration subcontractor of an approved health benefits plan by any State, the District of Columbia, or the Commonwealth of Puerto Rico, or by any political subdivision or other governmental authority thereof, with respect to any payment made from the Fund.

> "(2)  Paragraph (1) shall not be construed to exempt any carrier or underwriting or plan administration

subcontractor of an approved health benefits plan from the imposition, payment, or collection of a tax, fee, or other monetary payment on the net income or profit accruing to or realized by such carrier or underwriting or plan administration subcontractor from business conducted under this chapter, if that tax, fee, or payment is applicable to a broad range of business activity."

5 USC § 8909(f); *see* Pub L 101-508, Title VII, § 7002(c), 104 Stat 1388-330 (Nov 5, 1990) (also reprinted in Appendix).[13]

An October 16, 1990,[14] report by the House Committee on the Budget (the "1990 House Budget Committee Report") stated:

"Section 8002(c) amends section 8909 of title 5, United States Code, by adding a new subsection (f) to the section. The new subsection would exempt from any tax, fee, or other monetary payment (imposed by any State, the District of Columbia, or the Commonwealth of Puerto Rico, or any political subdivision or other governmental authority thereof) any carrier or underwriting or plan administration subcontractor of an approved health benefits plan with respect to payments made from the Employees Health Benefits Fund. This State *premium tax* exemption is intended to be similar in nature and application to the existing premium tax exemptions applicable to the Employees' Life Insurance Fund, as set forth in section 8714 of title 5, United States Code."

HR Rep No 881, 101st Cong, 2d Sess, *reprinted in* 1990 USCCAN 2017, 2184 (emphasis added).[15]

---

[13] 5 USC section 8909(f) has not been amended to date.

[14] The portion of the bill that became the FEHBP Preemption Statute was not amended between October 16, 1990, and enactment. *Compare* 136 Cong Rec 29,782 (Oct 16, 1990) (providing language of House Resolution (HR) 5835; amending 5 USC section 8909 to include subsection (f)) *with* 5 USC section 8909(f). A Conference Committee Report issued 10 days after the 1990 House Budget Committee Report did not discuss preemption. HR Conf Rep No 964, 101st Cong, 2nd Sess, *reprinted in* 1990 USCCAN 2374.

[15] The referenced statute applicable to the Employees' Life Insurance Fund provides:

"(1) No tax, fee, or other monetary payment may be imposed or collected by any State, the District of Columbia, or the Commonwealth of Puerto Rico, or by any political subdivision or other governmental authority thereof, on, or with respect to, any premium paid under an insurance policy purchased under this chapter.

Shortly after Congress enacted the FEHBP Preemption Statute, the OPM issued proposed regulations, explaining in the preamble:

"The proposed regulation also amends part 1631 of title 48 of the Code of Federal Regulations to implement section 7002(c) of Public Law 101-508, which exempts FEHB Program carriers, underwriters, and plan administrators, from State taxes on FEHB premiums. Under the provisions of the Federal Acquisition Regulation [FAR 31.205-41], such taxes have previously been chargeable to the FEHB contract. The new law necessitates a clarification to this provision in OPM's implementing regulations at 1631.205-41 stating that the charge of a *premium tax* by a carrier to the FEHB contract will not be an allowable cost."

56 Fed Reg 20575 (May 6, 1991) (emphasis added; brackets in original).[16] A proposed regulation provided:

---

"(2) Paragraph (1) of this subsection shall not be construed to exempt any company issuing a policy of insurance under this chapter from the imposition, payment, or collection of a tax, fee, or other monetary payment on the net income or profit accruing to or realized by that company from business conducted under this chapter, if that tax, fee, or payment is applicable to a broad range of business activity."

5 USC § 8714(c)(1) (1988) (added by Omnibus Budget Reconciliation Act 1980, Pub L 96-499, § 405, 94 Stat 2607 (Dec 5, 1980)). A House Budget Committee report explains that "[Federal Employees' Group Life Insurance (FEGLI)] premiums should [not] be subject to state taxation since the FEGLI program is, in effect, a self-insured program." HR Rep No 1167, 96th Cong, 2d Sess, *reprinted in* 1980 USCCAN 5526, 5653. The later Conference Committee report incorporated the House provision. *See* HR Conf Rep No 1479, 96th Cong, 2d Sess, *reprinted in* 1980 USCCAN 5903, 5912. Regulations regarding preemption were not adopted until 1993. *See* 58 Fed Reg 40377 (July 28, 1993) (adopting 48 CFR § 2129.302(a) ("5 USC 8714(c)(1) prohibits the imposition of taxes, fees, or other monetary payment on FEGLI Program premiums by any State ***. [The foregoing provision] shall not be construed to exempt *** from *** a tax, fee, or other monetary payment on the net income or profit *** from business conducted under the FEGLI Program if the tax, fee, or payment is applicable to a broad range of business activity.").

[16] At the time, the Federal Acquisition Regulations provided in part:

"(a) The following types of costs are allowable:

"(1) Federal, State, and local taxes (see part 29), except as otherwise provided in paragraph (b) below that are required to be and are paid or accrued in accordance with generally accepted accounting principles."

48 CFR § 31.205-41(a) (1990). Taxes not allowable as costs under paragraph (b) included federal income taxes, and taxes on the value, use, possession or sale of real or personal property not used in connection with work on government contracts. *See* 48 CFR § 31.205-41(b) (1990). The reference to "Part 29" in 48 CFR section 31.205-41(a) (1990) was to 48 CFR sections 29.000 to 29.402-2, which prescribes policies and procedures for asserting the federal government's

"5 USC 8909(f)(1) prohibits the imposition of taxes, fees, or other monetary payment, directly or indirectly, on FEHB premiums by any State, the District of Columbia, or the Commonwealth of Puerto Rico, or by any political subdivision or other governmental authority of those entities. Therefore, FAR 31.205-41 is modified to include those taxes as unallowable costs."

*Id*. During the comment period that followed, OPM received the following comments:

"Two commenters thought that the regulations concerning premium taxes should be amended to state that such taxes are unallowable costs, except when the carrier, underwriter, or administrative subcontractor is compelled by a court order to pay such taxes. OPM does not feel that we need to regulate on this issue.

"Another commenter proposed additional wording to the premium tax regulations to clarify their applicability. We have revised the regulations to incorporate this change, with modification from the legislative language.

"One commenter suggested that a section of the [Federal Employee Health Benefits Acquisition Regulation (FEHBAR)] defining premium taxes be removed, since it is not fully consistent with the current law. The definition has been revised in accordance with the revised premium tax language elsewhere in the FEHBAR."

56 Fed Reg 57496 (Nov 12, 1991). In response, OPM added the text italicized below to the regulation, which has not since been amended:

"5 USC 8909(f)(1) prohibits the imposition of taxes, fees, or other monetary payment, directly or indirectly, on FEHB premiums by any State, the District of Columbia, or the Commonwealth of Puerto Rico, or by any political subdivision or other governmental authority of those entities. Therefore, FAR 31.205-41 is modified to include those taxes as unallowable costs. *The prohibited payments, referred to elsewhere in these regulations as 'premium taxes,' applies to all payments directed by States or municipalities, regardless of how they may be titled, to whom they must be paid, or the purpose for which they are collected, and it applies to all forms of direct and indirect measurements on FEHBP*

---

constitutional immunity from state and local taxes, as well as statutory exemptions from federal excise taxes and from state and local taxes. *See* 48 CFR § 29.000.

*premiums, however modified, to include cost per contract or enrollee, with the sole exception of a tax on net income or profit, if that tax, fee, or payment is applicable to a broad range of business activity.*"

48 CFR § 1631.205-41 (emphasis added) (the "FEHBP Preemption Regulation") (also reprinted in Appendix); *see* 56 Fed Reg 57496-97 (Nov 12, 1991).

### 2.   *Medicare+Choice*

In 1997, Congress enacted the predecessor of Medicare Advantage, known as Medicare+Choice (M+C), as part of the Balanced Budget Act of 1997 (BBA 1997). Pub L 105-33, Title IV, Subtitle A, Ch 1, Subch A, § 4001, 111 Stat 275-327 (Aug 5, 1997). M+C became the third "part" of the ultimately four-part Medicare program: Part A (Hospital Insurance); Part B (Medical Insurance); Part C (Medicare Advantage); and Part D (Drug Coverage (added in 2005)). *See generally* 63 Fed Reg 34968 (June 26, 1998) (preamble to M+C interim regulations); 70 Fed Reg 4589-90 (Jan 28, 2005) (preamble to Part D regulations). M+C was an overlay on the "original" fee-for-service Medicare program (Parts A and B), in which the federal government generally pays health care service providers directly without an insurer intermediary.[17] *See* 42 USC § 1395g(a) (Part A: "The *** provider of services shall be paid, *** from the Federal Hospital Insurance Trust Fund, the amounts so determined ***.").

As later explained by DHHS, the goal of M+C was to provide enrollees with more benefits than they received under original Medicare, but at costs lower than they would pay under private health insurance:

"[T]he primary goal of the M+C program is to provide Medicare beneficiaries with a wider range of health plan choices to complement the Original Medicare option. Alternatives available to beneficiaries under the M+C program include both the traditional managed care plans (such as HMOs) that have participated in Medicare on a capitated payment basis under section 1876, as well as a

---

[17] As exceptions to the "original" fee-for-service model, certain health maintenance organizations and other types of managed care plans participated in the Medicare program beginning in the 1970s. *See* HR Conf Rep No 391, 108th Cong, 1st Sess, *reprinted in* 2003 USCCAN 1808, 1895-96.

broader range of plans comparable to those now available through private insurance.”

*See* 63 Fed Reg 34968 (preamble to 1998 regulations). M+C enrollees received their health coverage from an eligible insurer (called an “M+C organization”). *See* 42 USC § 1395w-25(a) (requiring licensure as health insurer). M+C organizations were required to enter into contracts with the federal government. *See* 42 USC § 1395w-27 (2000); *cf.* 42 USC § 1395w-27 (same for MA organizations in 2017). An M+C organization agreed to offer certain benefits in exchange for payments from CMS and premiums from enrollees in amounts approved by DHHS. *See* 42 USC §§ 1395w-23, 1395w-24 (2000) (payments from CMS); *cf.* 42 USC §§ 1395w-23, 1395w-24 (same for MA organizations in 2017); 42 USC § 1395w-24(a)(5) (2000) (premium approval under M+C); 42 USC § 1395w-24(a)(5) (premium approval under MA).

The BBA 1997 included a preemption provision for payments from CMS to M+C organizations:

“No State may impose a premium tax or similar tax with respect to payments to Medicare+Choice organizations under section 1853 [codified at 42 USC § 1395w-23].”

Pub L 105-33, § 1854(g), 111 Stat 312 (1997) (codified at 42 USC § 1395w-24(g)). Congressional committees described the preemption provision in two publications:

“10.   Preemption of State Premium Taxes:

“The current law on federal preemption of state premium taxes or fees on Federal payments from the FEHB fund to health plans will be *extended* to Federal payments to Medicare+Choice plans and other health plans receiving capitated payments from the Medicare Trust Funds.”

News Release, Committee on Finance, *Summary of Medicare Provisions in the Conference Report on the Balanced Budget Act of 1997* (July 30, 1997) (“1997 Senate Finance Committee News Release”) (emphasis added; underscoring in original).

“*h.   Prohibition of State Imposition of Premium Taxes.* No state could impose a premium tax or similar tax on the premiums of MedicarePlus plans or the offering of such plans.

"*Reason for Change.* The Committee believes it is important to continue to allow beneficiaries to share in the efficiency gains of private managed care plans by receiving extra benefits. To assure that these benefits are provided at the appropriate levels, the Secretary is instructed to perform periodic auditing of the financial records of the MedicarePlus organizations.

"Because States may not impose taxes on the traditional Medicare fee-for-service program, the Committee believes it is appropriate to limit the imposition of State premium taxes and similar premium charges on MedicarePlus plans. A *similar* rule applies to health plans offered to federal government employees and dependents through the FEHBP."

Balanced Budget Act of 1997, *Report of the Committee on the Budget*, HR Rep No 149, 105th Cong, 1st Sess (1997), 1266 ("1997 House Budget Committee Report") (emphasis in last paragraph added).[18]

In 1998, CMS published an interim final regulation, with a 60-day comment period, providing in part:

"(a)   *Basic rule.* No premium tax, fee, or other similar assessment may be imposed by any State, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, and American Samoa, or any of their political subdivision or other governmental authorities with respect to any payment HCFA[19] makes on behalf of M+C enrollees under subpart F of this part.

---

[18]  The 1997 House Budget Committee Report refers to the as-introduced version of HR 2015, which was amended before its enactment as BBA 1997. The court does not consider the amendments (shown below in strike-through and bold) material to the Budget Committee's comments on the "similar rule" of preemption under the FEHBP act:

"No state may impose a premium tax or similar tax with respect to ~~premiums on MedicarePlus plans or the offering of such plans~~ **payments to Medicare+Choice organizations under section 1853**."

1997 House Budget Committee Report at 108 (providing text of preemption provision as introduced); Pub L 105-33 § 1854(g), 111 Stat 312 (Aug 5, 1997) (text of preemption provision as enacted).

[19]  The HCFA was the Health Care Finance Administration. The HCFA was renamed to the Centers for Medicare & Medicaid Services in 2001. Press Release: *The New Centers for Medicare & Medicaid Services* (June 14, 2001), *available at* http://cdn.ca9.uscourts.gov/datastore/library/2013/02/26/Providence_pressrelease.pdf (last visited Mar 31, 2021). Except when quoting other sources, this order refers to the agency as "CMS" before and after the name change.

"(b)   *Construction*. Nothing in this section shall be construed to exempt any M+C organization from taxes, fees, or other monetary assessments related to the net income or profit that accrues to, or is realized by, the organization from business conducted under this part, if that tax, fee, or payment is applicable to a broad range of business activity."

63 Fed Reg 35099 (June 26, 1998) (adopting 42 CFR § 422.404). In the preamble, DHHS explained:

"The BBA does not define the phrase 'premium or other similar tax,' other than by reference to the applicability of such a tax to revenue received from the Federal Government for health plan enrollees. Relying again on the FEHBP statute, we have included a provision in the regulations (§ 422.404(b)) that serves to clarify the scope of what constitutes a prohibited premium tax. The FEHBP statute expressly permits States to impose taxes on the profits arising from participation as an FEHBP plan, to the extent that the tax on profits, or other taxes or fees, are general business taxes. We have included a similar exception because such taxes are not taxes applied directly and exclusively to premium revenues, and therefore should not be prohibited under section 1854(g)."

63 Fed Reg 35014 (June 26, 1998). Under the BBA 1997, only payments from CMS to M+C organizations were preempted from taxation; premium payments by enrollees to M+C organizations were not preempted. *See id*. at 35013 ("This prohibition [on premium taxes] does not apply to enrollee premium payments made to M+C plans, which are authorized under section 1854.").

3.   *Medicare Advantage*

By 2003, Congress became aware of problems with the M+C program. The number of enrollees in Medicare private plans had fallen from 6.2 million in 1998 to 4.6 million in November 2003, and the number of plans had fallen from 346 to 155. HR Conf Rep No 391, 108th Cong, 1st Sess, *reprinted in* 2003 USCCAN 1808, 1896 (the "MA Conference Committee Report"). Congress identified the cause, in part, as "unpredictable and insufficient payments" compared to the growth in payments under traditional fee-for-service Medicare. *Id.* Congress responded by enacting the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (the

MMA 2003), replacing M+C with Medicare Advantage.[20] *See* Pub L 108-173, Title II, 117 Stat 2176-2221 (Dec 8, 2003). Goals of the MMA 2003 included increasing payments to MA organizations in order to keep pace with fee-for-service Medicare and, in turn, requiring MA organizations to submit bids to DHHS that incorporate "all their revenue needs, both the medical costs of providing benefits and associated administrative costs (including profits or retained earnings)." MA Conference Committee Report at 527 (increasing payments); *id.* at 542 (requiring bids). The MMA 2003 granted DHHS negotiating authority that was similar to the authority of OPM to negotiate bids under the FEHBP. *Id.* at 543. As later described by DHHS, the general goal was to enable better coverage at lower costs for enrollees, thus attracting more enrollees:

> "Over time, participating plans will be under continued competitive pressure to improve their benefits, reduce their premiums and cost sharing, and improve their networks and services, in order to gain or retain enrollees."

70 Fed Reg 4589 (Jan 28, 2005) (preamble to final regulations).

The MMA 2003 expanded the scope of the MA Preemption Statute, addressing BBA 1997's omission of any preemption for enrollee premiums by adding the text shown in italics below:

> "No State may impose a premium tax or similar tax with respect to payments to [MA] Organizations under section 1395w-23 of this title *or premiums paid to such organizations under this part.*"[21]

Pub L 108-173, Title II, § 232(b), 117 Stat 2066, 2208 (Dec 8, 2003) (codified at 42 USC § 1328w-24(g)) (also reprinted in Appendix) (emphasis added). DHHS then amended its regulations to reflect the broader scope of preemption, adding to the body of subsection (a) the text shown in italics below:

> "(a)   *Basic rule.*   No premium tax, fee, or other similar assessment may be imposed by any State, the District of

---

[20]  The MMA 2003 also deemed all references to M+C as references to Medicare Advantage. Pub L 108-173, Title II, § 201(b), 117 Stat 2176 (Dec 8, 2003).

[21]  "This part" refers to 42 USC chapter 7, subchapter XVIII, Part C, which encompasses 42 USC sections 1395w-21 through 1395w-28.

Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, and American Samoa, or any of their political subdivisions or other governmental authorities with respect to any payment CMS makes on behalf of MA enrollees under subpart G of this part,[22] *or with respect to any payment made to MA plans by beneficiaries, or payment to MA plans by a third party on a beneficiary's behalf.*

(b) *Construction.* Nothing in this section shall be construed to exempt any MA organization from taxes, fees, or other monetary assessments related to the net income or profit that accrues to, or is realized by, the organization from business conducted under this part, if that tax, fee, or payment is applicable to a broad range of business activity."

42 CFR § 422.404 (2006) (the "MA Preemption Regulation") (also reprinted in Appendix) (second emphasis added). The preamble to the final regulations states:

"Medicare law prohibiting State taxes on section 1853 payments to M+C organizations, that is, payments made by CMS to health plans contracting with Medicare, was established by the Balanced Budget Act of 1997. That prohibition did not apply to enrollee premium payments made to M+C plans.

"Section 232(b) of the MMA 2003 has expanded the prohibition on State taxes for MA plans, addressed in statute at section 1854(g), to apply to both section 1853 payments to MA plans and to section 1854 enrollee premium payments to MA plans."

70 Fed Reg 4693 (Jan 28, 2005). Responding to comments submitted during the notice-and-comment period, DHHS stated:

"*Comment*:   A commenter encourages CMS to clearly communicate the provisions of the new law and regulations relating to both preemption of State law and restrictions on States imposing premium tax on funds collected from enrollees to all States. The commentator states that they have already received questions from States related to premium tax and believe a communication from CMS would help clear up any confusion the States may have.

---

[22] "Subpart G of this part" refers to the regulations under 42 USC section 1395w-23 (Payments to [MA] Organizations). *See* 42 CFR Part 422 Subpart G (Payments to Medicare Advantage Organizations).

"*Response*:    We believe the MA regulations at [42 CFR] § 422.404 are absolutely clear that States cannot levy a premium tax, fee, or any other fee on the payment CMS makes to MA organizations (on behalf of MA enrollees) or payments made by MA enrollees to MA plans or by a third party to a MA plan on a beneficiaries behalf."

70 Fed Reg 4665 (Jan 28, 2005) (italics in original).

C.   *Analysis of Structure and Legislative History*

Regarding the structure or context of the MA Preemption Statute, the court first concludes that substantial connections support treating BBA 1997 (establishing M+C) and the 1990 FEHBP Preemption Statute as relevant context. The court views the M+C program as the direct predecessor to the Medicare Advantage program. *See* Pub L 108-173, Title II, § 201, 117 Stat 2176 (Dec 8, 2003) (deeming all references to "M+C" as references to Medicare Advantage and requiring DHHS to "provide for an appropriate transition in the use of the terms 'Medicare+Choice' and 'Medicare Advantage'"). The framers of both M+C and the Medicare Advantage program also drew significantly on Congress's experience with the FEHBP, which was the first large health care program administered by private insurers selected and paid by the federal government, with contributions from enrollees. *See, e.g.*, Pub L 108-173, § 222(a)(1)(A), 117 Stat 2195 (Dec 8, 2003) (amending 42 USC § 1395w-24 (a)(6)(B)(ii); applying certain FEHBP standards in Medicare Advantage bidding process); 1997 House Budget Committee Report at 1266 (describing FEHBP preemption as a "similar rule"); 1997 Senate Finance Committee News Release ("The current law on federal preemption of state premium taxes or fees on Federal payments from the FEHB fund to health plans will be extended" to Medicare+Choice plans.).

Having concluded that the requisite connection exists among the three laws, the court first turns to the legislative history of the MMA 2003 itself for insights on the meaning of "premium tax or similar tax." This legislative history shows that Congress's overall purpose was to expand Medicare coverage while controlling costs, but the legislative history includes nothing that directly clarifies the meaning of the MA Preemption Statute.

The legislative history of the MMA 2003's predecessor act, BBA 1997, includes the 1997 Senate Finance Committee News Release and the 1997 House Budget Committee Report. The Senate publication states that the "current law on federal preemption of state premium taxes or fees on Federal payments from the FEHB fund to health plans will be extended" to the payments under the Medicare Advantage act, while the House publication describes the FEHBP's preemption provision as "similar" to the MA Preemption Statute. The Senate Finance Committee's term "extended" implies an intention to increase the reach of the preemption provisions under the FEHBP and to make that same law also apply to M+C payments under the 1997 BBA.[23] On the other hand, the House Budget Committee's term "similar" is broader and could imply either an extension of the FEHBP act preemption laws (with the only difference being the type of benefit program and premiums to which those laws apply), or an intention to incorporate only certain features of the FEHBP Preemption Statute. *See Webster's* at 2120 (defining "similar" as, in part, "having characteristics in common : very much alike : COMPARABLE" and "alike in substance or essentials"). The court reserves a conclusion, for now, on whether Congress intended to import the law of preemption from the FEHBP act, or instead to create a similar but distinct preemption regime for the M+C act. The court turns to the FEHBP act to better understand what the 1997 committee members were referring to and what they

---

[23] The contemporaneous definition of "extend" was, in relevant part:

"**5a:** to cause to stretch out or reach (as from one point to another) <[extend]­ing the railroad to the next city> **:** cause to span an interval (as of distance, space, or time <a rope bridge was [extend]ed over the chasm> **:** push to a farther point <[extend]ing the frontiers of knowledge> <city boundaries were [extend]ed to take in the entire county ***> **:** open out (a compass) **b :** to cause to be longer **:** LENGTHEN, PROLONG, PROTRACT *** **d :** to bring to a further degree of development, the Anglo-Saxons [extend]ed the use of the plow ***> **:** cause to be more nearly complete or perfect **:** ADVANCE, FURTHER <[extend]ing man's knowledge of the universe> <the rest of the decade consolidated and [extend]ed those gains *** [**6**]**b :** to increase the scope, meaning, or application of <[extend]ing the sense of a word> <the name . . . was easily [extend]ed to the new land ***> <[extend] the force of the laws> **:** increase the action or capacity of <beauty, I suppose, opens the heart, [extend]s the consciousness ***> **:** make more comprehensive, inclusive, or intensive **:** BROADEN, AMPLIFY <[extend]ing the range of their duties>[.]"

*Webster's* at 804 (unabridged ed 1993) (italics omitted; boldface in original).

could have meant by "extending" the FEHBP preemption provision or crafting a "similar" provision for the M+C act.

In contrast to the MA Preemption Statute, which refers simply to a "premium tax or similar tax" without any definition, the text of the FEHBP Preemption Statute never uses the term "premium tax." Instead, the FEHBP Preemption Statute uses a comparatively lengthy and broad description of the types of state government charges that are preempted, referring to any "tax, fee, or other monetary payment," whether imposed "directly or indirectly." It also includes an equally lengthy express saving clause that exempts from preemption a tax, fee or payment on the "net income or profit" of the insurer or other private organization "if that tax, fee, or payment is applicable to a broad range of business activity." Reading the FEHBP Preemption Statute side by side with the MA Preemption Statute (see Appendix), the court is struck by the exhaustive length of the former and the brevity of the latter. The court sees no indication that Congress in 1997 intended to create a new preemption regime with any material difference from the FEHBP Preemption Statute. The court sees in this comparison a textual clue suggesting that Congress in 1997 may have used the phrase "premium tax or similar tax" as shorthand for the detailed regime it had enacted seven years earlier.

Further context is found in the 1990 House Budget Committee Report, which uses the term "premium tax" to refer to the charges that the FEHBP act preempts. *See* 1990 House Budget Committee Report at 976-77 ("The conference agreement includes the House and Senate provisions: requiring that FEHBP carriers implement cost-containment measures; *exempting the FEHBP from state premium taxes*[.]" (Emphasis added.)). The court finds it significant that a Congressional committee that helped craft the FEHBP Preemption Statute put that two-word term into the public record in 1990 to denote the various types of state charges described in the statute. The court finds it reasonable to conclude that Congress in 1997 used the short term "premium tax or similar tax" to refer to the same subject matter. Based on this context, the court tentatively concludes that Congress intended the MA Preemption

Statute, 42 USC section 1328w-24(g), as enacted in 1997, and amended in 2003, to preempt the same class of taxes as the FEHBP Preemption Statute in 5 USC section 8909(f).

Although the FEHBP Preemption Statute fleshes out the meaning of a "premium tax or similar tax," it stops short of addressing the key issue in this case. Subsection (1) prohibits a tax that "directly or indirectly" is imposed "with respect to" the premiums that the federal government pays, and subsection (2) saves a tax on "net income or profit" if "applicable to a broad range of business activity." The text does not specify whether a tax not imposed on or measured by net income, and not imposed *exclusively* on gross premiums received by insurers, is preempted. Neither the preemption statute applicable to Employees' Life Insurance Fund premiums nor the legislative history of the FEHBP Preemption Statute adds to the analysis. The court proceeds to the applicable regulations.

D.   *Analysis of Regulations*

The court considers three regulations relevant. The MA Preemption Regulation as amended in 2005 to implement the MA Preemption Statute obviously is relevant as an interpretation of the statute at issue. The same regulation as originally adopted under the BBA 1997 is relevant because it interprets the predecessor statute, which enacted today's phrase "premium tax or similar tax." And the FEHBP Preemption Regulation is relevant both because it interprets a statute to which two congressional committees referred in 1997, and because the regulation itself potentially has the force of law and therefore may be part of the "current law on federal preemption" to which the Senate Committee referred when creating the M+C program in the 1997 BBA.

Applying principles of federal interpretation, the court first considers what weight to assign to the regulations. In general, the court must (1) determine whether the statute in question is ambiguous, and if so, defer to an agency regulation that addresses the ambiguity if (2) the regulation "was promulgated in the exercise" of Congress's delegation of authority to the agency "generally to make rules carrying the force of law," and (3) the regulation is based on a

"permissible construction" of the statute. *Mead Corp.*, 533 US at 226-27; *Chevron*, 467 US at 842-45; *see Friends of the Columbia River Gorge, Inc.*, 346 Or at 378 (explaining that Oregon courts must apply *Chevron* deference when interpreting federal statutes "if the federal interpretative methodology so demands").

The court first concludes that each statute is ambiguous for the reasons already discussed. The MA Preemption Statute does not define "premium tax or similar tax," leaving ample room for DHHS's interpretation. The FEHBP Preemption Statute also leaves an ambiguity because it defines in subsection (1) which taxes are preempted and in subsection (2) which taxes are saved, but it does not expressly state whether the taxes saved by subsection (2) are the *only* taxes that a state may impose with respect to premiums.

Second, the court readily finds that all three sets of regulations satisfy the procedural criterion, as all were promulgated in the exercise of a Congressional delegation of authority to "make rules carrying the force of law." *See Mead Corp.*, 533 US at 226-27. In the case of the M+C and Medicare Advantage programs, the BBA 1997 expressly delegated authority to the secretary of DHHS to issue regulations:

> "The Secretary shall establish by regulation other standards *** for [MA] organizations and plans consistent with, and to carry out, this part. The Secretary shall publish such regulations by June 1, 1998. In order to carry out this requirement in a timely manner, the Secretary may promulgate regulations that take effect on an interim basis, after notice and pending opportunity for public comment."

Pub L 105-33, Title IV, § 1856(b)(1), 111 Stat 319 (Aug 5, 1997). All regulations were published in the Federal Register and were subject to a notice-and-comment period. *See* 70 Fed Reg 4588 (Jan 28, 2005) (announcing final Medicare Advantage regulations following public notice-and-comment period); 63 Fed Reg 34968 (June 26, 1998) (announcing interim final M+C rule with comment period).

In the case of the FEHBP regulations, the delegation of authority appears in 5 USC section 8913(a), which states:

"The Office of Personnel Management may prescribe regulations necessary to carry out this chapter."[24]

*See* 56 Fed Reg 20575 (May 6, 1991). OPM published proposed regulations in the Federal Register, took comments, and published its responses to commenters when it published the final regulations. *Id.* at 20574 (proposing rule; providing for comment period); 56 Fed Reg 57496 (Nov 12, 1991) (publishing final rule after comment period).

Finally, the court considers whether each set of regulations is a "permissible construction" of its respective statute. As to the MA Preemption Statute, the regulations (1) add to the undefined term "premium tax or similar tax" a reference to a "fee, or other similar assessment" and (2) add a saving clause to prevent preemption of "taxes, fees, or other monetary assessments related to the net income or profit *** if that tax, fee, or payment is applicable to a broad range of business activity." 42 CFR § 422.404. The court does not find the addition of "fee" or "assessment" significant for purposes of this case, as there is no dispute that the Oregon charge at issue is a "tax." The saving clause in the MA Preemption Regulation uses language similar to the saving clause expressly codified in the FEHBP Preemption Statute. The court readily finds the saving clause in the regulation a permissible construction of the MA Preemption Statute for the reasons discussed above: the act that created Medicare Advantage cross-references the FEHBP statutes, and the legislative history of the act creating the M+C program refers directly to the FEHBP Preemption Statute. *See* Pub L 108-173, § 222(a)(1)(A), 117 Stat 2195 (Dec 8, 2003); 1997 House Budget Committee Report at 1266; 1997 Senate Finance Committee News Release. However, although the MA Preemption Regulation is entitled to deference, it does not resolve the issue whether all state taxes, other than those covered by the saving clause, are preempted.

The court proceeds to the FEHBP Preemption Regulation. In response to comments on the proposed version, the final regulation declares that a broadly applicable

---

[24] The text of 5 USC section 8913(a) was identical when OPM promulgated the FEHBP Preemption Regulation.

net income tax is the "sole exception" to preemption under the FEHBP Preemption Statute:

> "The prohibited payments, referred to elsewhere in these regulations as 'premium taxes,' applies to all payments directed by States or municipalities, regardless of how they may be titled, to whom they must be paid, or the purpose for which they are collected, and it applies to all forms of direct and indirect measurements on FEHBP premiums, however modified, to include cost per contract or enrollee, with the *sole exception* of a tax on net income or profit, if that tax, fee, or payment is applicable to a broad range of business activity."

56 Fed Reg 57496-497 (Nov 12, 1991) (emphasis added) (publishing the final version of 48 CFR § 1631.205-41). Under the FEHBP Preemption Regulation, the only type of tax allowed to be imposed on premiums, directly or indirectly, is a tax on net income or profit, and only if the tax is applicable to a broad range of business activity. This language resolves any ambiguity about the scope of the preemption and saving clauses in subsections (1) and (2) of the FEHBP Preemption Statute by preempting all state taxes on premiums other than broadly imposed net income taxes. As applied in this case, this text would preempt imposition of the tax under ORS 317.090 and allow only the net income taxes under ORS 317.070 and, if applicable, ORS 318.020. The court finds this interpretation "permissible" because of the broad language found in subsection (1) of the FEHBP Preemption Statute: "No *tax, fee, or other monetary payment* may be imposed, *directly or indirectly*, \*\*\* by any State \*\*\* with respect to any payment made from the Fund." 5 USC § 8909(f)(1) (emphases added). That language is consistent with the broad range of taxes that previously had been *allowed* as reimbursable costs under the Federal Acquisition Regulations. *See* 48 CFR § 31.205-41(a), (b) (1990) (allowing "Federal, State, and local taxes \*\*\*"; disallowing only "Federal income and excess profits taxes," taxes on property used solely in connection with work other than on government contracts, and other taxes not relevant here). The court concludes that OPM reasonably could read the FEHBP Preemption Statute as an effort to eliminate the need to reimburse contractors for all taxes within the very broad category that contractors otherwise would have claimed as

a reimbursable expense, except broad-based state or local net income taxes.

The court concludes that the FEHBP Preemption Regulation is dispositive. As to the substantive issue in this case, that regulation resolves the "exclusivity" ambiguity by declaring with the force of law that only a broadly applicable tax on net income or profits may be imposed on premiums—at least premiums paid under the FEHBP. And the court is persuaded that Congress in 1997 intended to import this meaning into the MA Preemption Statute by using, without definition, the same two-word phrase "premium tax" that the House Budget Committee, and OPM by regulation, had recently used to describe the charges preempted under the FEHBP. Under *Chevron*, the FEHBP Preemption Regulation was part of the "current law on federal preemption of state premium taxes" that the Senate Committee in 1997 stated would be "extended" to payments under the 1997 BBA.

E.   *The Parties' Arguments Based on Structure, Regulations, and Other Agency Interpretations*

The department argues that the tax under ORS 317.090 is not preempted because it is protected by the saving clause in the MA Preemption Regulation, which provides:

> "Nothing in this section shall be construed to exempt any MA organization from taxes, fees, or other monetary assessments *related to the net income or profit* that accrues to, or is realized by, the organization from business conducted under this part, *if that tax, fee, or payment is applicable to a broad range of business activity.*"

42 CFR § 422.404(b) (emphases added). First, the department asserts that the tax under ORS 317.090 is "related to" net income or "related to" Oregon's net income tax. In its opening brief, the department argues:

> "As a floor to the broad-based tax measured by the net income and the equivalent to a phase-out of deductions in which the phase-out varies based on the amount of gross income, the minimum tax is a tax 'related to the net income or profit' realized by [taxpayer]."[25]

---

[25] Similarly, the department argues that the tax under ORS 317.090 is "a part of" the net income tax because it is a floor to the net income tax.

On reply, the department stresses the relationship of the tax under ORS 317.090 to the tax that is measured by or according to net income under ORS 317.070: "[T]he minimum tax, as a floor to the tax measured by net income under ORS chapter 317, is related to that tax on net income[.]" "[T]he minimum tax amount under ORS 317.090 is 'related to' the tax measured by net income. A minimum tax, by the very fact that it is a 'minimum,' can be determined only by reference or relation to that to which it is a minimum."

The department relies on the ambiguous term "related to" in the saving clause of 42 CFR section 422.404(b), which arguably can encompass a broad range of connections between the tax and the concept of "net income." In theory, a tax "related to" net income might range from a tax actually "imposed on" or "measured by" net income,[26] to, conceivably, a tax imposed on or measured by a different tax base but connected with a net income tax by the statutory structure or by the intention of the state legislature that the tax operate in tandem with a net income tax. *See Webster's* at 1916 (defining "relation" as, in part, "an aspect or quality (as resemblance, direction, difference) that can be predicated only of two or more things taken together : something perceived or discovered by observing or thinking about two or more things at the same time : CONNECTION"). However, based on the analysis above of the statutory text, structure and legislative history, as well as the applicable regulations, the court concludes that Congress and DHHS intended only the narrow meaning in the saving clause of the FEHBP Preemption Statute, which saves only a "tax *** *on* the net income or profit" of the insurer (and only "if that tax *** is applicable to a broad range of business activity"). 5 USC § 8909(f)(2) (emphasis added).[27]

---

[26] The corporation excise tax under ORS 317.060 is "measured by or according to net income," while its complementary corporation income tax is "imposed *** upon" Oregon-source taxable income. *See Capital One Finance, Inc. v. Dept. of Rev.*, 363 Or 441, 442-45, 423 P3d 80 (2018) (explaining relationship and requirement to construe the taxes together).

[27] Similarly, the department argues that the regulation under the MA Preemption Statute does not preempt the tax under ORS 317.070 because, unlike its counterpart under the FEHBP Preemption Statute, "[D]HHS did not make net income taxes or taxes relating to net income taxes the 'sole exception' from the federal preemption, in contrast to 48 CFR § 1631.205-41." While it is correct that the saving clause in the Medicare Advantage regulation, 42 CFR section 422.404(b),

The department also likens the tax under ORS 317.090 to "a phase-out of deductions in which the phase-out varies based on the amount of gross income," arguing that the legislature could have achieved the same economic result as the minimum tax by designing a feature within the structure of the net income tax. The court need not consider whether a nominally net income tax containing a hypothetical provision that gradually eliminates deductions and essentially converts the tax into a tax on gross receipts would be preempted. The tax before the court is relatively straightforward: It is imposed by a statute that describes (1) its subject (corporations "carrying on or doing business" in Oregon and filing returns under ORS 317.710); (2) the tax base (Oregon sales); and (3) the amount that must be paid ($150 to $100,000, depending on Oregon sales). For an insurer, the tax base is further defined as expressly and solely measured by "direct premiums" reported to DCBS as explained above. *See* ORS 317.090(1)(a)(C); OAR 150-317-0170(4)(m); ORS 317.660(1)(b). The tax under ORS 317.090 is not imposed "on the net income or profit" of an insurer. On the contrary, ORS 317.655(1) expressly makes "net income" the tax base of the *excise* tax under ORS 317.070. ORS 317.090 deviates from that tax base by ignoring other sources of revenue, as well as all deductions. (Net income takes into account revenue from premiums, annuity considerations, net investment income, fees from investment management and other revenue sources, as well as various expenses.) The court can only conclude that the tax under ORS 317.090 is not "related to" "net income or profit" under 42 CFR section 422.404(b) and therefore is a "premium tax or similar tax" within the meaning of 42 USC section 1328w 24(g).[28]

The department argues further that the tax under ORS 317.090 is not preempted because it is not a "tax[] applied directly and exclusively to premium revenues" as

---

does not contain a counterpart to the "sole exception" clause, neither does it negate an intention to make net income taxes the sole exception. The Medicare Advantage regulation is silent on that point. For the reasons discussed, the court construes that ambiguity in favor of consistency with the FEHBP regulation.

[28] Having concluded that the tax under ORS 317.090 is not "related to" net income, the court finds it unnecessary to consider whether the tax satisfies the second condition in 42 CFR section 422.404(b), that the tax be "applicable to a broad range of business activity." The court expresses no view on that question.

described in the preamble to the interim final regulation adopted under the BBA 1997. 63 Fed Reg 35014 (June 26, 1998). Leaving aside whether the court must defer to this passage,[29] the court disagrees with the department's interpretation of it. First, the court considers the quoted phrase in the context of the entire paragraph in the preamble:

> "The BBA does not define the phrase 'premium tax or other similar tax,' other than by reference to the applicability of such a tax to revenue received from the Federal Government for health plan enrollees. Relying again on the FEHBP statute, we have included a provision in the regulations (§ 422.404(b)) that serves to clarify the scope of what constitutes a prohibited premium tax. The FEHBP statute expressly permits States to impose taxes on the profits arising from participation as an FEHBP plan, to the extent that the tax on profits, or other taxes or fees, are general business taxes. We have included a similar exception because such taxes are not taxes applied directly and exclusively to premium revenues, and therefore should not be prohibited under section 1854(g) [(42 USC § 1395w-24(g))]."

63 Fed Reg 35014 (June 26, 1998). The sentences preceding the passage quoted by the department refer twice to the FEHBP and show that DHHS is "[r]elying again on the FEHBP statute." *Id.* The passage the department quotes merely states DHHS's rationale for that reliance; the court does not read it as implicitly deviating from the scope of the FEHBP statute. Moreover, the quoted passage does not explain what is meant by "taxes applied directly and exclusively to premium revenues." The department appears to assume that "exclusively" means that the tax is imposed only on insurers and not on other taxpayers. However, given that the saving clause exempts net income taxes from preemption, a more plausible interpretation is that DHHS intended to distinguish a

---

[29] The court has concluded above that the text of the MA Preemption Regulation is, by itself, ambiguous, but its meaning is clear when read together with the FEHBP Preemption Regulation. The court questions, therefore, whether the MA Preemption Regulation is "genuinely ambiguous" as required for deference to sub-regulatory interpretations under *Auer v. Robbins*, 519 US 452, 117 S Ct 905, 137 L Ed 2d 79 (1997). *See Kisor v. Wilkie*, ___ US ___, 139 S Ct 2400, 2415, 204 L Ed 2d 841 (2019) ("First and foremost, a court should not afford *Auer* deference unless the regulation is genuinely ambiguous."); *Eastern Oregon Mining Assoc.*, 365 Or at 363 (discussing "genuinely ambiguous" test).

tax applied "exclusively to premium revenues" from a tax applied to premiums and other revenues, less expenses, *i.e.*, a tax on net income or profit. Because the quoted passage reasonably can be so read, it does not change the court's conclusion that Congress intended the MA Preemption Statute, 42 USC section 1328w-24(g), to have the same meaning as the FEHBP Preemption Statute, as interpreted by the FEHBP Preemption Regulation.

## V.   CONCLUSION

Multiple indicators persuade the court that Congress in 1997 intended the undefined phrase "premium taxes or similar taxes" to mean the same kinds of taxes and other charges that it had defined exhaustively seven years earlier in the FEHBP Preemption Statute. When writing the relevant text of the MA Preemption Statute in 1997, Congress had before it a record consisting of its own 1990 committee comments, as well as the FEHBP Preemption Regulation, labeling those taxes and charges as "premium taxes." The FEHBP Preemption Regulation also declared, with the force of law, that broadly applicable taxes "on" net income are the "sole exception" to preemption under the FEHBP Preemption Statute. Importing the scope and meaning of the FEHBP Preemption Statute and Regulation was consistent with Congress's clearly stated goals to control the cost of the M+C and Medicare Advantage programs because it prevented insurers from claiming reimbursement for state taxes other than broadly applicable net income taxes.

When viewed in isolation, the MA Preemption Statute and the MA Preemption Regulation use terms that are ambiguous. However, when viewed within the context of the FEHBP Preemption Statute and Regulation, Congress and DHHS "expressed clearly" their intention to resolve those ambiguities in ways that cut against the department here. Oregon's minimum tax under ORS 317.090 is not a tax "on" net income. It is a "premium tax or similar tax" as applied to MA organizations because it is "imposed, directly or indirectly" on "direct premiums." The tax under ORS 317.090 is therefore preempted by 42 USC section 1395w-24(g). Now, therefore,

IT IS ORDERED that Plaintiff's Motion for Summary Judgment is granted; and

IT IS FURTHER ORDERED that Defendant's Cross-Motion for Summary Judgment is denied.

APPENDIX

## Selected Statutes and Regulations

| **MA Preemption Statute, 42 USC § 1395w-24(g)** | **FEHBP Preemption Statute, 5 USC § 8909(f)** |
|---|---|
| "No State may impose a premium tax or similar tax with respect to payments to [MA] Organizations under section 1395w-23 of this title or premiums paid to such organizations under this part." | "(1) No tax, fee, or other monetary payment may be imposed, directly or indirectly, on a carrier or an underwriting or plan administration subcontractor of an approved health benefits plan by any State, the District of Columbia, or the Commonwealth of Puerto Rico, or by any political subdivision or other governmental authority thereof, with respect to any payment made from the Fund.

"(2) Paragraph (1) shall not be construed to exempt any carrier or underwriting or plan administration subcontractor of an approved health benefits plan from the imposition, payment, or collection of a tax, fee, or other monetary payment on the net income or profit accruing to or realized by such carrier or underwriting or plan administration subcontractor from business conducted under this chapter, if that tax, fee, or payment is applicable to a broad range of business activity." |

| MA Preemption Regulation, 42 CFR § 422.404 | FEHBP Preemption Regulation, 48 CFR § 1631.205-41 |
|---|---|
| "(a) *Basic rule.* No premium tax, fee, or other similar assessment may be imposed by any State, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, and American Samoa, or any of their political subdivisions or other governmental authorities with respect to any payment CMS makes on behalf of MA enrollees under subpart G of this part, or with respect to any payment made to MA plans by beneficiaries, or payment to MA plans by a third party on a beneficiary's behalf. "(b) *Construction.* Nothing in this section shall be construed to exempt any MA organization from taxes, fees, or other monetary assessments related to the net income or profit that accrues to, or is realized by, the organization from business conducted under this part, if that tax, fee, or payment is applicable to a broad range of business activity." | "5 USC 8909(f)(1) prohibits the imposition of taxes, fees, or other monetary payment, directly or indirectly, on FEHB premiums by any State, the District of Columbia, or the Commonwealth of Puerto Rico, or by any political subdivision or other governmental authority of those entities. Therefore, FAR 31.205-41 is modified to include those taxes as unallowable costs. The prohibited payments, referred to elsewhere in these regulations as 'premium taxes,' applies to all payments directed by States or municipalities, regardless of how they may be titled, to whom they must be paid, or the purpose for which they are collected, and it applies to all forms of direct and indirect measurements on FEHBP premiums, however modified, to include cost per contract or enrollee, with the sole exception of a tax on net income or profit, if that tax, fee, or payment is applicable to a broad range of business activity." |